Gregory RUSSEAU, Appellant,

v.

The STATE of Texas.

No. AP–74466.

Court of Criminal Appeals of Texas.

June 29, 2005.

Rehearing Denied Oct. 5, 2005.

Donald F. Killingsworth, Tyler, for Appellant.

Michael J. Sandlin, Assistant District Attorney, Tyler, Matthew Paul, State's Attorney, Austin, for State.

HOLCOMB, J., delivered the opinion of the Court, in which PRICE, WOMACK, JOHNSON, and COCHRAN, JJ., joined.

A Smith County jury found appellant guilty of capital murder under Texas Penal Code § 19.03(a)(2). Appellant's punishment was assessed at death. We will affirm in part and reverse in part.

### The Record Evidence

The record reflects the following: On May 30, 2001, 75–year–old James Syvertson was murdered at his Tyler auto repair garage. Syvertson's widow testified at trial that he left for work at approximately 7:00 a.m. on the day in question and that she spoke with him on the telephone sometime that morning. She further testified that he ate lunch at a "Luby's" cafeteria every day and that he usually left the garage at about 10:45 a.m. in order to "beat the crowd." The manager of the "Luby's" cafeteria testified that he saw Syvertson at approximately 11:00 a.m. on the day in question.

Mrs. Syvertson testified that she went to Syvertson's garage sometime between 11:00 a.m. and noon. At that time, she noticed Syvertson's gray Chevrolet Corsica parked outside. The doors to the garage were locked. She knocked on the doors but got no answer, so she left.

Katie Jordan testified that she contacted Syvertson by telephone sometime between 11:30 and 11:45 a.m. Syvertson told her that he could do some repair work for her employee, Bob Bruner, if he brought his car to the garage right away. When Bruner arrived at the garage between 12:20 and 12:30 p.m., the gray Corsica was parked outside, a light was on inside the garage, and a large fan was running on the side of the garage, but the doors to the garage were locked. Bruner knocked but got no answer. Bruner parked his car outside the garage and left. At 1:30 p.m., Bruner called Syvertson from his cell phone but got no answer. Bruner drove by the garage at about 2:00 p.m. The gray Corsica was still parked outside, and the light and fan were still on. Bruner returned to the garage at about 5:30 p.m. The gray Corsica was still parked outside, the light and fan were still on, and the garage doors were locked. Bruner knocked on the garage doors again but got no answer.

Mrs. Syvertson testified that she went back to the garage sometime in the afternoon and found the doors still locked. She knocked but got no answer. She went to get her daughter, who had a key to the garage. When they returned at 7:00 p.m., the gray Corsica was gone. Once inside the garage, they found Syvertson's body lying face down in a pool of blood next to a white Chevrolet Corsica. (Apparently, Syvertson was working on the white Corsica when he was murdered.) Rigor mortis had set in, and it appeared that Syvertson had been hit in the head several times with a hard object. The wallet he usually carried and the keys he usually kept clipped to his belt loop were both missing, and one of his pants pockets had been turned inside out. Several valuable tools were also missing from the garage. A bolt on an office door was broken and hanging by a single screw. Police testified that the door "looked like it had been kicked in."

The medical examiner who performed the autopsy on Syvertson's body testified that the manner of death was homicide and the cause of death was blunt force head injuries. Syvertson suffered multiple abrasions and lacerations to the front and back of his head. Many of the abrasions had a crescent or half-moon shape, and one had a circular outline. The blows were delivered with a blunt object that had a round, flat surface and was either fairly heavy or used with a great deal of force. The medical examiner estimated that the time of death was between 11:00 a.m. and 2:00 p.m.

Several witnesses testified that they saw appellant in the vicinity of the garage on the day of the murder. Robert Menefee testified that appellant came to his house "sometime after lunch" and inquired about buying some illicit drugs. Terry Seaton testified that appellant arrived at his house on foot at 3:00 p.m. Appellant told Seaton that he had been getting "high" on crack cocaine and asked Seaton whether he would sell him some crack. Seaton refused to sell drugs to appellant but gave appellant a small amount of change and drove him to "some duplexes" nearby.

At about 7:30 p.m., appellant arrived at the home of his friend Lisa Tucker, who was about to leave on a date with her boyfriend, Marcus Tilley. Appellant told Tucker and Tilley that his car had broken down, and he asked for a ride to his mother's house. On the way, appellant pointed to a gray Corsica parked behind a house and told them that it was his wife's car and that it had stalled. As they approached the intersection near Syvertson's garage, they saw police, an ambulance, and crime scene tape. Tucker and Tilley wanted to drive by the garage to see what was going on, but appellant asked that they continue

driving. Tilley decided to turn and drive by the garage. Before they reached appellant's mother's house, appellant had Tilley drop him off "at a house on Gaston Street." Menefee's residence was on Gaston Street.

Appellant visited Menefee's residence again that evening. They talked briefly, and appellant left on foot. Between 9:00 and 10:00 p.m., appellant returned to Seaton's house and spoke to him for a few minutes, then continued down the alley on foot.

Lashundra Hall testified that she saw appellant smoking crack cocaine in Longview sometime in the afternoon or evening. She saw him again at about 3:20 a.m. the next morning, and appellant was driving a gray Corsica. He asked her where he could "get more crack and rent the car out for crack." She got into the car, but they were stopped by Longview police about ten minutes later. Police discovered title and registration documents to the gray Corsica in appellant's pocket. Syvertson's keys were in the ignition.

Fingerprint and DNA evidence recovered from the garage connected appellant to the crime. Appellant's fingerprints and a palm print were found on the white Corsica next to Syvertson's body. Syvertson's son testified that a hammer leaning against a plastic bottle on a shelf near the body was out of place. Hairs found on the bottle were consistent with appellant's DNA.

Witnesses testified that a man named Ray Charles Berry was in the vicinity of Syvertson's garage at 1:30 p.m. on the day of the murder. Berry, who lived in the neighborhood, was seen standing near Syvertson's garage at 1:30 p.m. eating lunch out of a brown paper sack. No evidence linked Berry to the crime; Berry's fingerprints did not match any of those found on the white Corsica. In a hearing outside the presence of the jury, Berry invoked his Fifth Amendment right against self-incrimination.

### The Sufficiency of the Evidence

In his first point of error, appellant argues that the record evidence is legally insufficient to support his conviction for capital murder. In evaluating the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

To convict appellant of capital murder, the jury was required to find beyond a reasonable doubt that appellant intentionally committed murder in the course of committing or attempting to commit robbery or burglary. Appellant argues that the evidence is legally insufficient to show murder in the course of robbery because the State failed to prove intent to rob Syvertson during or prior to his murder. However, the evidence in a capital murder prosecution need be sufficient to establish only one of the underlying felonies alleged in the indictment. *Ladd v. State,* 3 S.W.3d 547, 557 (Tex.Crim.App.1999); *Matamoros v. State,* 901 S.W.2d 470, 474 (Tex.Crim. App.1995). Thus, if the evidence in this case established burglary, we need not examine whether there was sufficient evidence to show robbery.

A person commits a burglary if, without the effective consent of the owner, he enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit a felony, theft, or an assault. *See* Tex. Pen.Code § 30.02. In a prosecution for capital murder, the requirement that a felony be com-

mitted is satisfied by the murder of the victim. *Matamoros,* 901 S.W.2d at 474. The evidence also showed a lack of consent to enter the garage. Specifically, police officers testified that the door to the office in the garage was damaged and looked as if it had been "kicked in." Based on the evidence at trial, a rational jury could have concluded beyond a reasonable doubt that appellant committed murder in the course of burglary. Point of error one is overruled.

 In his second point of error, appellant contends that the evidence of intent to commit robbery or burglary was factually insufficient to support the jury's verdict. In a factual sufficiency review, we view all of the evidence in a neutral light and we will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and unjust, or the contrary evidence is so strong that the "beyond a reasonable doubt" standard of proof could not have been met. *Zuniga v. State,* 144 S.W.3d 477, 484–85 (Tex.Crim.App.2004). A clearly wrong and unjust verdict occurs when the jury's finding "shocks the conscience" or "clearly demonstrates bias." *Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Crim.App.1997).

Appellant offered evidence that Berry may have committed the crime, that no one saw appellant in or near the garage, and that no one proved appellant stole the gray Corsica. Viewing all the evidence in a neutral light, we conclude that the evidence supporting the verdict was not so weak as to be clearly wrong and unjust. There was ample evidence showing that appellant was in the midst of a drug binge on the day of the murder, that he was in search of crack cocaine, and that he was willing to rent out Syvertson's gray Corsi-

ca in order to get more drugs. Appellant's fingerprints, a palm print, and some of his hair were found next to Syvertson's body. Appellant was found driving Syvertson's gray Corsica and the title documents were found in appellant's pocket. The keys to the gray Corsica, which Syvertson usually wore on his belt, were found in the ignition of the car when appellant was stopped by police. In light of the overwhelmingly inculpatory evidence, the contrary evidence is not so strong that the standard of proof could not have been met. Point of error two is overruled.

 In his tenth point of error, appellant challenges the legal sufficiency of the evidence at the punishment phase of the trial. Appellant claims the evidence was legally insufficient to support the jury's affirmative answer to the special issue concerning his future dangerousness.[1] We review the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have concluded beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex.Code Crim. Proc. art. 37.071 § 2(b)(1).

At the punishment phase, the State introduced evidence that appellant had several prior felony and misdemeanor convictions for, among other things, engaging in organized criminal activity, burglary of a habitation, theft, burglary of a building, attempted burglary of a building, burglary of a vehicle, and possession of a controlled substance; that he committed numerous disciplinary infractions while incarcerated in the Smith County Jail and in the Texas Department of Criminal Justice, Institu-

---

1. Appellant also argues that the evidence of future dangerousness is factually insufficient. However, we do not conduct factual sufficiency reviews of the future dangerousness special issue. *McGinn v. State,* 961 S.W.2d 161, 169 (Tex.Crim.App.1998).

tional Division (TDCJ);[2] and that he had multiple probation and parole violations. In addition, a psychologist and two psychiatrists testified that appellant exhibited characteristics of anti-social personality disorder and that he would likely commit criminal acts of violence in the future. One of the psychiatrists also testified, without objection, about appellant's numerous disciplinary offenses while incarcerated in the Smith County Jail and in the Texas Department of Criminal Justice. All of this evidence, when combined with the evidence of the horrific offense of which appellant was convicted in this case, was clearly sufficient to support the jury's affirmative answer to the future dangerousness special issue. Point of error ten is overruled.

### *Jury Selection*

In points of error fifteen and fifteen-A, appellant contends that the trial court erroneously granted the State's challenge of prospective juror Tiscareno for cause, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, § 10, of the Texas Constitution. We disagree.

Prospective jurors who can set aside their beliefs against capital punishment and honestly answer the special issues are not properly challengeable for cause. *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Prospective jurors are challengeable for cause if their views about the death penalty would prevent or substantially impair the performance of their duties in accordance with their instructions and oath. *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

We afford the trial court considerable deference, because it is in the best position to evaluate a prospective juror's demeanor and responses. *Colburn v. State,* 966 S.W.2d 511, 517 (Tex.Crim.App. 1998). We will reverse a trial court's ruling on a challenge for cause only if a clear abuse of discretion is evident. *Ibid.* When a prospective juror's answers are vacillating, unclear, or contradictory, we accord deference to the trial court's decision. We will not second-guess the trial court when the prospective jurors are persistently uncertain about their ability to follow the law.

In her jury questionnaire, Tiscareno stated that she was generally opposed to the death penalty, that she could not return a verdict which resulted in the death penalty under any circumstances, and that her opposition to the death penalty would interfere with her ability to serve as a juror. But when the trial court questioned Tiscareno, she stated that she could follow the law and answer the special issues based on the evidence even if it would result in the death penalty. When questioned by the State, Tiscareno again said that she could answer the special issues based on the evidence, despite her personal beliefs about the death penalty, but that she would hold the State to a higher burden of proof than beyond a reasonable doubt because it was a capital case. Upon questioning by defense counsel, Tiscareno stated she could follow the law regarding the burden of proof. The trial court then explained the burden of proof and questioned Tiscareno again. After expressing doubts, Tiscareno finally stated that she could hold the State to its proper burden.

Tiscareno was challenged for cause. Upon granting the challenge, the trial court concluded that Tiscareno had "a bias

---

**2.** When conducting a legal sufficiency review, we consider all the record evidence, including evidence that was inadmissible. *Dewberry v.* *State,* 4 S.W.3d 735, 740 (Tex.Crim.App. 1999).

or prejudice as to the law upon which the State and the defense are entitled to rely." The trial court further stated: "She is vacillating with respect to her ability, and even when I questioned her at the very end to try to clarify it, she still vacillated in her ... answers to the Court."

We defer to the trial court's ruling on a challenge for cause, because the trial judge was present to observe the demeanor of the prospective juror and to listen to her tone of voice. *Feldman v. State*, 71 S.W.3d 738, 744 (Tex.Crim.App.2002). And, we give particular deference to the trial court when the potential juror's answers are vacillating, unclear or contradictory. *Ibid.* The record reflects that Tiscareno vacillated about her position on the death penalty and gave conflicting answers about her ability to follow the law; thus we defer to the trial court, as it was in a better position to evaluate her ability to serve on the jury. Points of error fifteen and fifteen-A are overruled.

### The Confrontation Clause Guarantee

In points of error sixteen and sixteen-A, appellant argues that the trial court violated his Sixth Amendment right to confront the witnesses against him when the court admitted in evidence, at the punishment phase, State's Exhibits numbers 242–254, which were Smith County Jail "incident reports," and State's Exhibits numbers 255–260, which were TDCJ "disciplinary reports." The trial court admitted these reports under the business records exception to the hearsay rule. *See* Tex.R. Evid. 803(6). The reports contained statements which appeared to have been written by corrections officers and which purported to document, in the most detailed and graphic of terms, numerous and repeated disciplinary offenses on the part of appellant while he was incarcerated. It further appeared that, in writing

the statements, the corrections officers relied upon their own observations or, in several instances, the observations of others. None of the individuals who supposedly observed appellant's disciplinary offenses testified at his trial. Appellant's alleged disciplinary offenses included threatening physical harm and even death to others, refusing to work or cooperate, breaking out of his cell at night, exposing himself and masturbating in front of jailers and other inmates, verbally abusing jailers and other inmates, fighting with other inmates, and possessing contraband, including improvised weapons. The record also reflects that most of the written reports detailing appellant's alleged disciplinary offenses were read aloud to the jury at the punishment phase and that the prosecutor referred to the reports numerous times during his closing argument at that phase.

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." This procedural guarantee is applicable in both federal and state prosecutions, *Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), and bars the admission of testimonial statements of a witness who does not appear at trial unless he is unavailable to testify *and* the defendant had a prior opportunity to cross-examine him, *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Generally speaking, a statement is "testimonial" if it is a solemn declaration made for the purpose of establishing some fact. *Id.* at 51, 124 S.Ct. 1354.

The reports in question contained testimonial statements which were inadmissible under the Confrontation Clause, because the State did not show that the declarants were unavailable to testify and appellant never had an opportunity to cross-examine

any of them. Indeed, the statements in the reports amounted to unsworn, *ex parte* affidavits of government employees and were the very type of evidence the Clause was intended to prohibit. *Id.* at 50, 124 S.Ct. 1354. The trial court erred in admitting those portions of the reports that contained the testimonial statements.

Having found constitutional error, we need not reverse the trial court's judgment if we conclude beyond a reasonable doubt that the error did not contribute to appellant's punishment. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See generally* W. La-Fave, *et al., Criminal Procedure* § 27.6(e) (2d ed.1999). We cannot so conclude, however. Given the highly damaging nature of the reports and the fact that the prosecutor repeatedly emphasized them during his closing argument, we find it impossible to say beyond a reasonable doubt that the reports did not influence the jury in its assessment of appellant's future dangerousness. We sustain points of error sixteen and sixteen-A.

■ In points of error seventeen and seventeen-A, appellant argues that the trial court violated his right to confrontation under Texas Constitution article I, § 10, when the court admitted in evidence State's Exhibits numbers 242–260. However, because appellant provides no argument or authority with respect to the protection provided by the Texas Constitution, we overrule these points of error as inadequately briefed. *See* Tex.R.App. Proc. 38.1(h).

*Scientific Evidence*

In points of error eight and nine, appellant challenges the trial court's admission of certain scientific evidence at both the guilt and punishment phases of the trial. He argues that the evidence failed to meet the admissibility requirements of *Kelly v. State*, 824 S.W.2d 568 (Tex.Crim.App. 1992).

■ Texas Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Under Rule 702, it is the trial court's responsibility to determine whether proffered scientific evidence is sufficiently reliable and relevant to assist the jury. *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim.App.2000). A trial court's ruling on the admissibility of scientific expert testimony is reviewed under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App.2000).

■ The proponent of scientific evidence must demonstrate to the trial court, by clear and convincing evidence, that the scientific evidence is reliable. *Id.* The proponent of "hard" scientific evidence [3] must satisfy three criteria to demonstrate reliability: (1) the underlying scientific theory is valid; (2) the technique applying the theory is valid; and, (3) the technique was properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573. Other non-exclusive factors that could affect a trial court's determination of reliability include: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underly-

---

**3.** In *Weatherred v. State,* 15 S.W.3d 540, 542 fn. 5 (Tex.Crim.App.2000), we discussed the difference between the "hard" sciences and the "soft" sciences.

ing scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *Ibid.*

█ In point of error eight, appellant asserts the trial court erred in admitting fingerprint-comparison evidence. Connie Castle, a crime-scene investigator with the Tyler Police Department, testified that she compared the fingerprints recovered from the crime scene to the fingerprints obtained from appellant and determined he was the person who left the fingerprints on the white Corsica. Defense counsel objected, and the trial court held a hearing to determine the reliability of the evidence. Castle testified that fingerprint comparison was a legitimate field of expertise, that the method she followed here was the accepted method within the field of expertise, and that the same method was used by the Federal Bureau of Investigation (FBI), the Department of Public Safety (DPS), and other law enforcement agencies. Castle also testified that she had sixteen years of experience in fingerprint comparison, that she had received training on the subject at numerous schools, and that she had routinely kept up with new techniques and developments within the field. She further testified that she had given expert testimony on fingerprint comparison numerous times in both state and federal court and that her findings in this case were reviewed and confirmed by at least three other people trained in the field, including a Tyler Police Department investigator and an FBI agent.

Walter Henson, a sixteen-year veteran of the DPS crime laboratory and a latent-fingerprint examiner, testified about the general reliability of fingerprint-comparison evidence. Henson testified that he is an instructor in fingerprint comparison, that he has compared hundreds of thousands of fingerprints in his career, that he has given expert testimony on fingerprint comparison in both state and federal courts, that he has received specialized training in fingerprint comparison from the FBI and the DPS, and that he had kept abreast of new technologies within the field. He testified further that peer review was a critical part of fingerprint comparison, and that there was "no known error rate attached to the comparison of latent prints." He further testified that courts have relied on fingerprint evidence for over one hundred years and that it is generally accepted in the scientific community that no two people have the same fingerprints.

Based on Castle's and Henson's testimony, the trial court found that the fingerprint evidence was relevant and reliable, that Castle was qualified to testify as an expert, that the underlying scientific theory and techniques were valid and were properly applied, that there was no rate of error, that the underlying scientific theory and technique were accepted as valid by the relevant scientific community, that other experts were available to test and evaluate the technique, and that the underlying scientific theory and techniques were explained with sufficient clarity.[4] The trial

4. Once a scientific principle is generally accepted in the pertinent professional community and has been accepted in a sufficient number of trial courts through adversarial *Kelly* hearings, subsequent courts may take judicial notice of the scientific validity (or invalidity)

of that scientific theory based upon the process, materials, and evidence produced in those prior hearings. *Hernandez v. State,* 116 S.W.3d 26, 29 (Tex.Crim.App.2003); *Weathered,* 15 S.W.3d at 542 n. 4. The trial court here took judicial notice "of the opinions of

court acknowledged the existence of articles calling for further testing of the theory and technique, but stated that "there's nothing that says this is not valid."

█ Despite its long history of general acceptance and admissibility in our trial courts, some tribunals have addressed concerns about, and challenges to, expert fingerprint comparison testimony. *See U.S. v. Mitchell,* 365 F.3d 215, 250–51 (3rd Cir. 2004); *U.S. v. Crisp,* 324 F.3d 261, 266–68 (4th Cir.2003); *U.S. v. Llera Plaza,* 188 F.Supp.2d 549 (E.D.Pa.2002) (op. on reh'g) (exhaustive account of fingerprint use as crime-detection technique, its origins and developmental history, and the present-day training and testing of forensic experts). In *Llera Plaza,* on rehearing, the district court reversed its own decision excluding expert testimony that a latent fingerprint was that of a particular person. Based on our review of the record and our own well-established history, we conclude that fingerprint-comparison testimony is admissible under Texas Rule of Evidence 702 because it is reliable and it assists the trier of fact in its task of determining whether a latent fingerprint is that of a particular person. Were we to be persuaded by the initial concerns of Judge Pollack in *Llera Plaza,* it would not affect our analysis, because the testimony in this case satisfied the factors set forth in *Kelly.* Therefore, the trial court did not abuse its discretion in admitting the fingerprint-comparison evidence. Point of error eight is overruled.

█ In point of error nine, appellant complains that the trial court erred in admitting the expert testimony of Dr. Sue Stone and Dr. Tynus McNeel that appellant posed a risk of future dangerousness because the State did not lay a proper foundation, as required by *Kelly v. State* and *Nenno v. State.*[5]

█ "When addressing fields of study aside from the hard sciences, such as the social sciences or fields that are based primarily upon experience and training as opposed to the scientific method, *Kelly's* requirement of reliability applies but with less rigor than to the hard sciences." *Nenno v. State,* 970 S.W.2d 549, 561 (Tex. Crim.App.1998). When "soft" sciences are at issue, the trial court should inquire: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies on or utilizes the principles involved in the field. *Ibid.*

Dr. Stone, a psychologist with the Texas Department of Criminal Justice (TDCJ), and Dr. McNeel, a privately employed psychiatrist, testified there was a probability appellant would commit criminal acts of violence in the future that would constitute a continuing threat to society. Prior to their testimony, the trial court held a hearing to determine the reliability of their testimony. Stone testified that she was a licensed psychologist with a doctorate in clinical psychology, that she had received post-doctorate specialized training in violence risk assessment, and that she gained experience in risk assessment while completing her post-doctoral training with TDCJ and while working for the Texas

---

the Texas Court of Criminal Appeals and the Twelfth Court of Appeals relative to the admissibility of fingerprint evidence," citing *Moore v. State,* 109 S.W.3d 537 (Tex.App.-Tyler 2001, pet. ref'd), and *Emerson v. State,* 880 S.W.2d 759 (Tex.Crim.App.1994).

5. State's witness Dr. Edward Brown Gripon also testified regarding appellant's risk of future dangerousness, but appellant does not challenge the admission of Gripon's testimony.

Youth Commission. Stone had given presentations on violence risk assessment to other mental-health professionals and had previously testified as an expert witness in a capital murder case.

Stone's opinion of appellant's future dangerousness was based on the offense reports, the autopsy report, crime-scene photographs, a videotape and transcript of appellant's interview with investigators, witness statements, transcripts of witness interviews, arrest records and prior-offense records, TDCJ institutional and parole records, Smith County jail and probation records, and news footage of the offense, crime scene, and bond hearing. When reviewing the material and making her assessment, she used a combination of theory and technique that had been subjected to peer review and publication and was generally accepted within the scientific community. She drew upon her training, education, and experience in clinical and forensic psychology, and thoroughly reviewed literature on violence risk assessment and psychopathy. She also used the "guideline of the DSM4," which is published by the American Psychiatric Association and widely used as a standard in the field.

McNeel testified that he was board-certified in general psychiatry, forensic psychiatry, and addiction psychiatry, and that he had testified on future dangerousness in a number of other cases. He testified that risk assessment of future dangerousness is a legitimate field of expertise. McNeel reviewed reports, pictures, jail records, prison records, parole records, and other discovery items in support of his testimony on future dangerousness, and he relied upon his specialized knowledge and his review of current scientific literature in the field. He testified that the theory and technique he used were derived from published research studies that had been sub-

jected to peer review and are generally accepted within the relevant scientific community.

The trial court found that the State met its burden of demonstrating the reliability of the opinion testimony and admitted the evidence in question. Based on the record before us, we conclude that the State met the requirements of *Kelly* and *Nenno*. Thus, the trial court did not abuse its discretion in admitting the expert testimony on future dangerousness. *See Griffith v. State*, 983 S.W.2d 282, 288 (Tex.Crim. App.1998) (potential of future dangerousness is a question of fact which the jury must answer and testimony from mental health experts is relevant to future dangerousness special issue). Point of error nine is overruled.

### *Improper Question*

In point of error eighteen, appellant argues that the State improperly questioned Dr. Sue Stone about the specifics of another capital case in which she had testified about future dangerousness. As noted, Stone concluded that there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. On cross-examination, defense counsel asked Stone whether she had previously testified about future dangerousness in a capital case. In response, she said she had testified as a witness for the State, that she had concluded there was a probability that the defendant in that case would be a continuing threat to society, and that she had never testified for the defense in a capital case.

On re-direct examination, the prosecutor asked Stone the name of the capital case in which she had previously testified for the State. Stone replied, "The Newton Anderson case." The prosecutor then asked Stone to tell the jury a little bit

about the facts of that case. Appellant immediately objected under Texas Rule of Evidence 403, complaining that to compare one capital murder case with another is highly prejudicial. The prosecutor responded that he was not attempting to compare the cases, but rather he wanted to show that Stone was "not just a rubber stamp for the State." The trial court sustained the objection, stating that the prosecutor could re-phrase the question in such as way as to not go into the details of the other case.

The prosecutor then asked whether Dr. Stone's evaluation of appellant's case was related in any way to her evaluation in the Newton Anderson case. Stone replied that it did not and confirmed that her opinion in appellant's case was based only upon the information of his case. When the prosecutor asked whether the jury assessed the death penalty in the Newton Anderson case, defense counsel immediately objected and requested an instruction to disregard. The trial court sustained the objection, sent the jury out of the courtroom, and denied defense counsel's motion for a mistrial. When the jury returned, the trial court explained that the State's question was "completely irrelevant and improper and impermissible." The trial court instructed the jury in pertinent part as follows:

> So I'm instructing you to completely disregard the last question asked by State's counsel. If that question in any way invited you to make a decision on an improper basis, I'm telling you, don't do it. I'm telling you that you are to make your decisions in this case based upon the evidence that's properly before you in the case.

> You are to disregard that question. You're not to consider it for any purpose whatsoever. You're to make your decisions on the evidence that's properly

before you in this case, individualized decision-making based upon proper evidence in this cause.

> That's what you've taken an oath to do, and with confidence that you're going to do that, the Court denies the motion for a mistrial made by the Defense.

The asking of an improper question will seldom call for a mistrial, because, in most cases, any harm can be cured by an instruction to disregard. *Ladd*, 3 S.W.3d at 567. A mistrial is required only when the improper question is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors. *Ibid.* We review the trial court's denial of a mistrial under an abuse of discretion standard.

The trial court did not abuse its discretion in denying appellant's motion for a mistrial, because the question at issue went unanswered and the trial court explained that the question was improper and that it should be disregarded. Moreover, the question was not of such character as to suggest the impossibility of withdrawing the impression produced on the jurors' minds. Point of error eighteen is overruled.

### Punishment Claims

In points of error three, four, and five, appellant argues that the Texas death penalty statute is unconstitutional because *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), require that the special issues be alleged in the indictment. He further asserts that the indictment was fundamentally defective and the trial court erred in failing to quash it.

In *Rayford v. State*, 125 S.W.3d 521, 533 (Tex.Crim.App.2003), we held that *Apprendi* does not require the State to allege the special issues in the indictment. Nor can we find such a requirement in *Ring*. Thus, we hold that *Apprendi* and *Ring* have no applicability to Article 37.071 in its current form. *See Rayford*, 125 S.W.3d at 534. Points of error three, four, and five are overruled.

In point of error six, appellant again cites *Apprendi* and *Ring* and argues that the Texas capital-sentencing scheme is unconstitutional because it fails to assign a burden of proof on the mitigation special issue. We have previously rejected this argument. *Rayford*, 125 S.W.3d at 533–34; *Resendiz v. State*, 112 S.W.3d 541, 549–50 (Tex.Crim.App.2003), *cert. denied*, 541 U.S. 1032, 124 S.Ct. 2098, 158 L.Ed.2d 713 (2004). Point of error six is overruled.

In point of error seven, appellant urges this Court to conduct a sufficiency review of the mitigation special issue and asserts that "the failure to do so violates [his] constitutional and statutory rights and renders the statute unconstitutional." Again, we do not review the sufficiency of the evidence to support a jury's negative answer to the mitigation special issue. *McGinn*, 961 S.W.2d at 166. We have rejected the claim that this deprives a defendant of "meaningful appellate review." *Green v. State*, 934 S.W.2d 92, 106–07 (Tex.Crim.App.1996); *McFarland v. State*, 928 S.W.2d 482, 498–99 (Tex.Crim.App.1996). We have also rejected the claim that the mitigation special issue violates the Eighth Amendment on the ground that meaningful appellate review of the jury's determination is impossible. *Prystash v. State*, 3 S.W.3d 522, 535–36 (Tex.Crim.App.1999). Point of error seven is overruled.

In point of error eleven, appellant contends that the "10–12 rule" violates the Eighth Amendment principles discussed in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). He further argues that the trial court violated his constitutional rights by instructing the jury in this manner. We have previously decided this issue adversely to appellant. *Williams v. State*, 937 S.W.2d 479, 490 (Tex.Crim.App.1996); *Lawton v. State*, 913 S.W.2d 542, 558–59 (Tex.Crim.App.1995). Point of error eleven is overruled.

In point of error twelve, appellant contends that Article 37.071 violates the Eighth and Fourteenth Amendments because it fails to require that jurors be informed that a single holdout juror on any special issue would result in an automatic life sentence. We have previously decided this issue adversely to appellant. *Shannon v. State*, 942 S.W.2d 591, 600–01 (Tex. Crim.App.1996); *Lawton*, 913 S.W.2d at 559. Point of error twelve is overruled.

In points of error thirteen and fourteen, appellant challenges the trial court's rulings on his "Motion to Preclude the Death Penalty as a Sentencing Option." Appellant alleges that the trial court erred "in quashing [his] subpoenas relating to [his] motion" and "refusing to allow [him] to make an offer of proof by question and answer when the trial court quashed his subpoenas." Appellant further requests an abatement of the appeal to permit counsel to develop the appellate record. *See Spence v. State*, 758 S.W.2d 597, 599–600 (Tex.Crim.App.1988).

Appellant alleged in his pretrial motion that the Texas death penalty statute was unconstitutional because it failed to provide a consistent statewide method for determining in which cases the death penalty would be sought. Appellant subpoenaed district attorneys and county judges from

several different counties to testify in connection with the motion. The trial court granted the State's motion to quash the subpoenas. Seven of the subpoenaed witnesses appeared at the hearing on appellant's motion, and appellant requested to set out their testimony in a bill of exception. The trial court refused to allow the testimony for the purposes of a bill of exception, because the witnesses had no personal knowledge about appellant's case. However, the trial court offered appellant additional time to propound "depositions on written questions" to persons in Smith County with relevant information as to whether appellant was "improperly pursued" in the instant case.

■ The trial court did not err in quashing the subpoenas. The State has discretion to seek the death penalty, and this discretion is not unconstitutional. *Hankins v. State*, 132 S.W.3d 380, 387 (Tex.Crim.App.2004); *Ladd*, 3 S.W.3d at 574. Appellant was not entitled to subpoena district attorneys and county judges and question them regarding the exercise of prosecutorial discretion which we have held to be constitutional. *See Hankins*, 132 S.W.3d at 388. Thus, an abatement would serve no purpose in the instant case.

Points of error thirteen and fourteen are overruled.

We affirm the judgment of the trial court as it relates to appellant's conviction, we reverse the judgment of the trial court as it relates to appellant's punishment, and we remand the case to the trial court for a new punishment hearing under Texas Code of Criminal Procedure article 44.29(c).

KEASLER, J., filed a dissenting opinion.

KELLER, P.J., and MEYERS and HERVEY, JJ., dissented without written opinion.

KEASLER, J., dissenting.

I dissent to the majority's resolution of points of error 16 and 16A.

The exhibits at issue in these points of error are business records. The Supreme Court specified in *Crawford v. Washington* that business records are not testimonial hearsay.[1] Many other courts have acknowledged this.[2] As a result, *Ohio v. Roberts*[3] controls.[4] And because these exhibits fall within a firmly rooted exception

1. 541 U.S. 36, 124 S.Ct. 1354, 1367, 158 L.Ed.2d 177 (2004).

2. *See, e.g., Rios v. Lansing*, 116 Fed.Appx. 983 (10th Cir.2004); *United States v. Guitierrez–Gonzales*, 2004 U.S.App. LEXIS 21038 *5–6 (5th Cir.2004); *United States v. Lee*, 374 F.3d 637, 644 (8th Cir.2004); *Johnson v. Renico*, 314 F.Supp.2d 700, 707 (E.D.Mich.2004); *United States v. Saner*, 313 F.Supp.2d 896, 900 n. 1 (S.D.Ind.2004); *Perkins v. State*, 897 So.2d 457, 464 (Ala.Crim.App.2004); *People v. Cervantes*, 12 Cal.Rptr.3d 774, 118 Cal. App.4th 162, 12 Cal.Rptr.3d 774, 782 n. 5 (2004); *People v. Schrek*, 2004 Colo.App. LEXIS 1712 *34 (Colo.App.2004); *State v. Rivera*, 268 Conn. 351, 844 A.2d 191, 202 n. 13 (2004); *People v. Capellan*, 6 Misc.3d 809, 791 N.Y.S.2d 315 (N.Y.Crim.Ct.2004); *People v.*

*Cortes*, 4 Misc.3d 575, 781 N.Y.S.2d 401, 403 (N.Y.2004); *State v. Blackstock*, 165 N.C.App. 50, 598 S.E.2d 412, 420 (2004); *State v. McKinney*, 2004 Ohio App. LEXIS 5033 *34 (Ohio App.2004); *State v. Mack*, 2004 Ore. LEXIS 792 *9 n. 5 (Ore.2004); *Commonwealth v. Eichele*, —— A.3d ——, 2004 WL 2002212, 2004 Pa. D. & C. LEXIS 39 *11 (Pa.Commw.Ct.2004); *Barela v. State*, 2004 WL 2192604 at *7, 2004 Tex.App. LEXIS 8802 *17 (Tex.App.-El Paso 2004); *Riner v. Commonwealth*, 268 Va. 296, 601 S.E.2d 555, 570 (2004); *State v. Manuel*, 275 Wis.2d 146, 685 N.W.2d 525, 532 n. 9 (App.2004).

3. 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

4. *Crawford*, 124 S.Ct. at 1373.

to the hearsay rule, they do not violate the Confrontation Clause.