

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-75,540

**RAMIRO F. GONZALES, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 04-02-9091-CR
### IN THE 38TH JUDICIAL DISTRICT COURT
### MEDINA COUNTY

PRICE, J., announced the judgment of the Court and delivered an opinion in which MEYERS, KEASLER and HOLCOMB, joined, and in which KELLER, P.J., and HERVEY and COCHRAN, JJ., joined except as to point of error one. JOHNSON, J., filed a concurring opinion. COHCRAN, J., filed a concurring opinion in which KELLER, P.J., and HERVEY, J., joined. WOMACK, J., filed a dissenting opinion.

### O P I N I O N

The appellant was convicted in August 2006 of capital murder.[1]  Based on the jury's

---

[1] TEX. PENAL CODE § 19.03(a)(2).

answers to the special issues set forth in the Texas Code of Criminal Procedure, Article 37.071, sections 2(b) and 2(e), the trial judge sentenced the appellant to death.[2] Direct appeal to this Court is automatic.[3] After reviewing the appellant's ten points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

The appellant was charged with intentionally causing the death of Bridget Townsend by shooting her with a firearm during the course of committing or attempting to commit aggravated sexual assault, kidnapping, or robbery. The evidence at trial established that, while he was in the Bandera County jail waiting to be transported to prison on another matter, the appellant asked to speak with the sheriff, James MacMillian. When MacMillian met with him, the appellant stated that he had information concerning Townsend, a person who had been reported missing almost two years earlier. Initially, MacMillian did not believe him, but when the appellant asserted that he could show MacMillian where Townsend's body was, MacMillian took him more seriously. With the appellant sitting in the passenger seat giving directions and the jail administrator riding in the back, MacMillian drove out of town to the ranch where the appellant and his family lived. After the paved road

---

[2] Art. 37.071, § 2(g). Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

[3] Art. 37.071, § 2(h).

ended at the ranch headquarters, they continued driving over caliche roads and jeep trails to a remote cedar-covered hillside. They then walked another hundred yards to the location where the appellant indicated that they would find Townsend's remains. As they walked, the appellant described the jewelry Townsend had been wearing, where she had been standing when he shot her, and where he had put her body. They saw a human skull about ten feet from the place the appellant said he had left her. They then observed other bones that had been scattered by wildlife, and they found jewelry that was similar to the jewelry described by the appellant. After MacMillian and the jail administrator tied yellow evidence tape on the trees to mark the location, they drove back to Bandera. MacMillian left markers along the route so that he would be able to retrace it.

The appellant volunteered two different stories during the drive back to the sheriff's office. Initially, he stated that some people in the Mexican Mafia had needed a place to dispose of a body, and so he let them use that location. Then, he stated that he was present while other people committed an offense, but all he did was show them how to get to that location. After they returned to the sheriff's office, the appellant gave additional conflicting stories. A Texas Ranger, Skylor Hearn, testified that the appellant first told him that the appellant had been hired by the Mexican Mafia and Townsend's boyfriend, Joe Leal, to kill Townsend. Next, the appellant indicated that the Mexican Mafia was not involved, but that he and Leal had agreed that he would kill Townsend. Finally, he stated that Leal had not been involved, and that he had killed Townsend on his own. The appellant then admitted that

his previous stories had been lies.  Hearn testified that the appellant provided details in his final story that were consistent with evidence that was discovered during the investigation.  The appellant gave a statement that was audiotaped and typed.  The appellant reviewed, revised, and signed the typed statement.  At trial, Hearn read the typed statement out loud.  The audiotape was played as well.

In his statement, the appellant related that Leal, Townsend's boyfriend, was his drug supplier.  On or about January 14, 2001, he had telephoned Leal's house because he wanted more drugs.  Townsend answered the phone and told him that Leal was at work.  Then, aware that Townsend was there, he drove to Leal's house in order to steal cocaine.  When Townsend answered the door, the appellant walked past her to the bedroom closet where he knew that Leal kept drugs, and he began searching.  He found between $150 and $500 in cash on a closet shelf, and he put it in his pocket.  He did not respond when Townsend asked him what he was doing.  Townsend picked up the telephone and started dialing, telling him that she was calling Leal.  The appellant pushed her down, dragged her into the bedroom, and tied her hands and feet with some nylon rope he had found in the closet.  He asked her if Leal had any drugs, and she told him no.  He then carried her to the front door, where he paused to turn out the lights so no one would see them, and then he carried her to his truck.

The appellant then drove Townsend to the ranch.  When they arrived, the appellant stopped long enough to retrieve a high-powered .243-caliber deer rifle with a scope that he knew was kept in his grandfather's ranch truck.  The appellant stated that, at the time he took

the rifle, he intended to shoot Townsend because he did not want her to tell anyone that he had "torn up" Leal's house and kidnapped her. Armed with the rifle, he got back into his truck and drove Townsend to the location where her remains were later found. He untied Townsend and walked her toward the brush, but when he started loading the rifle, Townsend began crying and asking for her mother. She told the appellant that she would give him money, drugs, or sex if he would spare her life. In response, the appellant unloaded the rifle and took Townsend back to his truck, where he had sex with her. After she dressed, he reloaded the rifle, walked her back into the brush, and shot her. He listened as her body hit the ground, and then he drove home. When he got back to his grandparents' house, he removed the empty shell casing from the rifle and slung the casing away from the house. He put the rifle back into his grandfather's ranch truck and went inside. There, he interacted with his family as though nothing had happened.

While Hearn was taking the appellant's statement, MacMillian showed investigators the location of Townsend's remains. They found Townsend's skull, most of her long bones and some small bones, her clothing, her jewelry, and her shoes. Her rib cage and vertebrae were never found. Gunshot residue tests on Townsend's shirt revealed the presence of lead. Hearn later seized three high-powered rifles with scopes that he found in the appellant's grandfather's house and ranch truck. He showed them to the appellant, along with a rifle that Hearn had borrowed from the sheriff's department, and asked the appellant if he recognized

any of them as the murder weapon.[4] The appellant immediately selected the .243-caliber rifle that Hearn had seized from the ranch truck.

Leal testified about the course of events that led him to report Townsend's disappearance to police. He had spoken to Townsend on the telephone around 6:00 p.m. or 7:00 p.m., and she told him that she had to get up early for work the next morning. When he came home from work a little after midnight, he believed that Townsend was asleep. Her truck was parked outside and things "looked normal." Inside, her purse and keys were on the counter as usual, but the house was cold because the heater had not been turned on. Townsend was not asleep on the couch where Leal had expected her to be, so he went into the bedroom. When he saw that she was not in the bed, he looked around and noticed that the door to the bedroom closet was open. A small box that he kept on a closet shelf was sitting out on the ironing board, open and empty. It had contained between $200 and $300 in cash. Leal testified that Townsend never took money from that box without asking him first. Becoming concerned, Leal began calling friends and family to see if anyone knew where Townsend was. His sister and his friend helped him search the neighborhood. When they could not find her, Leal called the police. He also contacted the appellant because Townsend had told him that the appellant had come by the house earlier that day, and Leal hoped that the appellant might have seen something while he was there. The appellant,

---

[4]

Hearn testified at trial that he had never conducted a gun line-up before, and he added the borrowed rifle to the collection in an effort to duplicate the controls typically used in a suspect line-up.

however, denied that he had been there that day. When Leal told the appellant that he might as well tell the truth because Townsend had told him that he had come by, the appellant continued to deny it.

## SUFFICIENCY OF THE EVIDENCE

In the appellant's first and second points of error, he claims that the evidence is legally and factually insufficient to support a finding of guilt. However, the appellant does not contend that the evidence taken as a whole is insufficient to sustain his conviction; rather, he complains that his confession is not sufficiently corroborated by independent evidence. Thus, the appellant has blended the standard for whether a confession is sufficiently corroborated with the standards for legal and factual sufficiency. These standards are distinct. In the interest of justice, we will consider each standard.

The appellant argues that his confession was not sufficiently corroborated by independent evidence tending to establish that he murdered Townsend by shooting her with a firearm, and that there was insufficient corroborating evidence tending to establish that he murdered her in the course of committing robbery, kidnapping, or aggravated sexual assault. The corroboration requirement assures that a conviction cannot be obtained solely on the basis of a confession, without some independent evidence that the charged offense was actually committed.[5] When the offense is capital murder charged as a murder in the course

---

[5] *Gribble v. State,* 808 S.W.2d 65, 71 (Tex. Crim. App. 1990) (plurality opinion) (observing that "the [corroboration or *corpus delicti*] rule peremptorily reduces the weight of admissible evidence for policy reasons originated by this Court without express legislative sanction," and so the

of committing another felony, independent evidence that a crime has been committed must corroborate both the murder and the underlying felony.[6]  "[T]he *corpus delicti* of murder is established if the evidence shows the death of a human being caused by the criminal act of another."[7]  Similarly, the underlying felony need not be conclusively proven by corroborative evidence; all that is required is that there be some evidence that renders the commission of the offense more probable than it would have been without the evidence.[8]  "It satisfies the *corpus delicti* rule if some evidence exists outside of the extra-judicial confession which, considered alone or in connection with the confession, shows that the crime actually occurred."[9]

---

quantum of independent corroborating evidence need not be great).

[6] *Cardenas v. State,* 30 S.W.3d 384, 390 (Tex. Crim. App. 2000).  It has been suggested that we should renounce the rule that in prosecutions brought under Section 19.03(a)(2) of the Penal Code, TEX. PEN. CODE § 19.03(a)(2), both murder and underlying felony must be corroborated.  Although the rule originated in a plurality opinion, *Gribble v. State*, *supra*, it has since been endorsed by a clear majority of the Court on a number of occasions.  *Chambers v. State*, 866 S.W.2d 9, 15 (Tex. Crim. App. 1993);  *Emery v. State*, 881 S.W.2d 702, 705 (Tex. Crim. App. 1994); *Williams v. State*, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997); *Rocha v. State*, 16 S.W.3d 1, 4-5 (Tex. Crim. App. 2000); *Cardenas v. State*, *supra*.  Because we will hold that the evidence in this case *does* corroborate at least one of the underlying felonies, there is no need to address the question whether we should renounce the rule, and hence, disavow those *post-Gribble* majority opinions in our unpublished opinion in this case.  The parties here have not briefed the question.  Better to save it for a later day when it has been specifically briefed by the parties and it might make a difference to the ultimate resolution of the appeal.

[7] *McDuff v. State,* 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

[8] *Salazar v. State,* 86 S.W.3d 640, 645 (Tex. Crim. App. 2002).

[9] *Id.*

Here, the jury was instructed that the appellant could not be convicted on the basis of his confession alone.[10] The jury heard testimony from MacMillian, Leal, and other witnesses that:

(a)     Townsend vanished from her home, suddenly and without a trace, leaving her keys, purse, and truck behind;

(b)     Townsend's remains were found in a remote location on the ranch where the appellant lived;

(c)     almost two years after Townsend's disappearance, the appellant directed the sheriff on a circuitous route over caliche roads, jeep trails, and scrub land to Townsend's remains;

(d)     a rifle matching the one the appellant said he had used to shoot Townsend was found on the ranch, in the place where the appellant said he had obtained it;

(e)     lead was detected on Townsend's shirt;

(f)     jewelry similar to that described by the appellant was found near Townsend's remains; and

(g)     money was taken from Townsend's house at the same time that she disappeared, in an amount and from a location that were consistent with the amount and location described by the appellant.

---

[10] The jury was charged:

Even though you should find from the evidence beyond a reasonable doubt that the defendant admitted that he committed the offense, if any, that such admission standing alone is not sufficient to authorize a conviction in the case.

Now, therefore, unless you find and believe that there is other evidence before you, which taken with the alleged statement of the defendant, convinces you beyond a reasonable doubt that the defendant is guilty as charged in the indictment, you will acquit the defendant and say by your verdict "Not Guilty."

As such, there was ample independent corroborative evidence rendering it more probable than it would have been otherwise that Townsend's death was caused by the criminal act of another.

Next, the appellant asserts that the independent evidence was not sufficient to corroborate his confession that he committed the underlying offenses of robbery, kidnapping, or aggravated sexual assault. However, the jury could convict the appellant of capital murder if it found the murder was committed during the course of any one of these disjunctively charged underlying offenses.[11] Here, the independent evidence sufficiently corroborated the appellant's confession to at least one of the underlying offenses.

Concerning the underlying offense of kidnapping, Leal's testimony was evidence that Townsend had planned to be at home, and was home, on the night she disappeared. Townsend's purse, keys, and truck were still at the house in their usual places when she left. These facts tended to show that Townsend did not leave home willingly. That she was moved from the house, and that there were no signs of a struggle or an injury, tended to show that she was alive when she left.[12] A rifle matching the one the appellant said he had used to shoot Townsend was found in his grandfather's ranch truck, where the appellant said he had obtained it, on the ranch where Townsend's remains were found. This evidence further

---

[11] *See Cardenas,* 30 S.W.3d at 391; *see also Kitchens v. State,* 823 S.W.2d 256, 259 (Tex. Crim. App. 1991) (quoting *Turner v. United States,* 396 U.S. 398, 420 (1970)).

[12] *See, e.g., Gribble,* 808 S.W.2d at 72.

indicates that Townsend was alive when she was taken from her house to the ranch. The appellant directed MacMillian on a circuitous route over caliche roads, jeep trails, and scrub land to the remote location of Townsend's remains. This fact corroborates his statement that he took her to that location.

There was also independent evidence to corroborate the appellant's confession to the robbery. Leal's testimony confirmed that money was taken from the house at the same time that Townsend disappeared. His testimony concerning the amount of money taken and its location on a shelf in his bedroom closet was consistent with the appellant's confession.[13] This evidence rendered the appellant's commission of robbery more probable than it would have been, if it had been based on the appellant's confession alone.

The State admitted in its response to the defense's motion for directed verdict that there was little independent evidence to corroborate the appellant's confession to the offense of aggravated sexual assault. However, the appellant's admissions to murder, kidnapping, and robbery were sufficiently corroborated by independent evidence, and so it is not necessary to address the matter further.

In performing a legal-sufficiency analysis, we review all of the evidence in the light most favorable to the verdict, and ask whether any rational trier of fact could have rendered

---

[13] During the missing-person investigation, law-enforcement officials had deliberately withheld Leal's report about the stolen money as a way to verify the reliability of anyone who might claim to have personal knowledge of Townsend's disappearance.

the jury's findings beyond a reasonable doubt.[14] In a factual-sufficiency review, the evidence is reviewed in a neutral light. Evidence can be factually insufficient if the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, or if the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust.[15] A reversal for factual insufficiency should not occur when "the greater weight and preponderance of the evidence actually favors conviction."[16] The sufficiency of the evidence is determined by evaluating the probative weight of all the evidence that the trial judge permitted the jury to consider.[17]

In this case, the evidence presented at trial was both legally and factually sufficient. The appellant's confession alone would have been sufficient to prove his guilt of all the elements of capital murder beyond a reasonable doubt.[18] The appellant did not present any contrary evidence. Points of error one and two are overruled.

---

[14]
   *Jackson v. Virginia,* 443 U.S. 307 (1979).

[15]
   *Roberts v. State,* 220 S.W.3d 521, 524 (Tex. Crim. App.), *cert. denied,* 128 S. Ct. 282 (2007) (citing *Watson v. State,* 204 S.W.3d 404, 414-415 (Tex. Crim. App. 2006)).

[16]
   *Watson,* 204 S.W.3d at 417.

[17]
   *Gribble,* 808 S.W.2d at 68.

[18]
   *See Fisher v. State,* 851 S.W.2d 298, 304 (Tex. Crim. App. 1993).

EXPERT TESTIMONY CONCERNING FUTURE DANGEROUSNESS

In points of error three, four, five, six, and seven, the appellant asserts that the trial court's admission of expert testimony concerning the appellant's future dangerousness violated the requirements of *Nenno*[19] and Rule 702 of the Texas Rules of Evidence, his right to due process as guaranteed by the Fifth Amendment to the United States Constitution,[20] and his right to a fair trial as guaranteed by the Sixth Amendment to the United States Constitution.

In points of error three and four, the appellant makes a global, broad-based assertion that the trial court erred by taking judicial notice of the relevance and reliability of psychiatric and psychological expert testimony on the issue of future dangerousness, rather than performing an independent "gatekeeping" function and making an independent determination as to whether a psychiatric or psychological expert could ever offer an opinion on future dangerousness that would be sufficiently relevant and reliable. However, the trial court did not abuse its discretion by taking judicial notice of the general relevance of such testimony. This Court has repeatedly held that testimony from mental-health experts is relevant to the issue of future dangerousness.[21] Furthermore, contrary to the appellant's assertion, the trial

---

[19] *Nenno v. State,* 970 S.W.2d 549 (Tex. Crim. App. 1998).

[20] In the interest of justice, we assume that the appellant intends to invoke his right to due process as guaranteed by the Fourteenth Amendment. *See, e.g., Washington v. Texas,* 388 U.S. 14, 18 (1967); *Ex parte Madding,* 70 S.W.3d 131, 136 (Tex. Crim. App. 2002).

[21] *See Nenno,* 970 S.W.2d at 561; *see also Russeau v. State,* 171 S.W.3d 871, 884 (Tex. Crim.

court did not take judicial notice of the reliability of the State's expert's testimony in this particular case; rather, the court held a hearing before making that determination. Points of error three and four are overruled.

In points of error five, six, and seven, the appellant asserts that the trial court erred in finding that the future-dangerousness testimony of the State's expert in this case, Dr. Edward Gripon, was based on scientifically valid reasoning or methodology. A trial court's ruling on the admissibility of scientific expert testimony is reviewed under an abuse of discretion standard.[22] When "soft" sciences are at issue, the trial court should inquire: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies on or utilizes the principles involved in the field.[23]

Prior to Gripon's testimony at trial, the trial court held a hearing to determine the reliability of his testimony. At the hearing, Gripon testified that he was a medical doctor with a specialty in psychiatry and board certifications in general and forensic psychiatry. He had performed forty to fifty future-dangerousness case evaluations and had testified on the issue of future dangerousness many times. He further testified that determinations of future dangerousness are a legitimate function of forensic psychiatrists. He related that forensic

App. 2005) (citing *Griffith v. State,* 983 S.W.2d 282, 288 (Tex. Crim. App. 1998)).

[22] *Russeau,* 171 S.W.3d at 881.

[23] *Id.* at 883-884.

psychiatrists typically rely on interviews, when allowed, and all of the collateral information available, to develop a profile of the person. The best predictor of future dangerousness would be the person's past history. Gripon testified that actuarial methods involved looking at how often things occurred in the death-row population versus the population of others convicted of murder. Gripon acknowledged that there was not one method of performing a future-dangerousness evaluation that was accepted as always right.

Gripon described his method as obtaining "every shred of information" he could get and then fitting it into a "mental health jigsaw puzzle" to see what it looked like. This method was a combination of a clinical assessment and the actuarial method. He would then determine whether he had enough information to feel comfortable in offering an opinion. In this case, he had reviewed the appellant's juvenile records, criminal records, offense reports, jail records, and audio recordings of four telephone calls the appellant had placed from jail. He also interviewed the appellant, but he did not discuss the results of that interview. He testified that he had not attempted to investigate beyond the materials furnished by the State because he felt that those materials were enough to enable him to offer an opinion. The trial court accepted him as an expert.

Based on the record before us, we find the reliability of Gripon's testimony to be sufficiently established under *Nenno* and Rule 702. Thus, we conclude that the trial court did not abuse its discretion in admitting the expert testimony on future dangerousness. Points of error five, six, and seven are overruled.

JURY INSTRUCTIONS CONCERNING MITIGATION

In point of error eight, the appellant complains that the trial court reversibly erred by instructing the jury that mitigating evidence was evidence that reduced his moral blameworthiness. The trial court did not err in giving this instruction, which was required by Article 37.071 of the Texas Code of Criminal Procedure.[24] We have previously rejected a challenge to the constitutionality of this instruction.[25] Point of error eight is overruled.

In point of error nine, the appellant asserts that the jury should have been instructed that mitigating evidence does not require a nexus between the evidence and the commission of the crime. However, the appellant has not identified any alleged mitigating evidence that could not be given effect under the instructions that were given.[26] The mitigation instruction permitted the jury to give full effect to the mitigating evidence.[27] Point of error nine is overruled.

THE 10-12 RULE

In point of error ten, the appellant asserts that the 10-12 rule is unconstitutional, as well as arbitrary and capricious, because it may arbitrarily force the jury to continue

---

[24] *See* Art. 37.071, § 2(f)(4).

[25] *See Lucero v. State,* 246 S.W.3d 86, 96 (Tex. Crim. App.), *cert. denied,* 129 S.Ct. 80 (2008).

[26] *See Roberts,* 220 S.W.3d at 534.

[27] *See Perry v. State,* 158 S.W.3d 438, 448-49 (Tex. Crim. App. 2004); *see also Jackson v. State,* 992 S.W.2d 469, 481 (Tex. Crim. App. 1999).

deliberating after every juror voted to answer a special issue in favor of the appellant, and it fails to inform the jurors that a sentence of life will result unless all 12 jurors answer "Yes" to future dangerousness and "No" to mitigation. We have previously rejected these arguments.[28] Point of error ten is overruled.

We affirm the judgment of the trial court.

Delivered:    June 17, 2009
Do Not Publish

---

[28] *See, e.g., Druery v. State,* 225 S.W.3d 491, 509 (Tex. Crim. App.), *cert. denied,* 128 S. Ct. 627 (2007); *Russeau,* 171 S.W.3d at 886.