IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,933





KENT WILLIAM SPROUSE, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL FROM CAUSE NO. 26,824CR


IN THE 40
TH JUDICIAL DISTRICT COURT


ELLIS COUNTY






 Price, J., delivered the opinion for a unanimous Court.


O P I N I O N



 In February 2004, a jury convicted appellant of a capital murder committed on
October 6, 2002. (1) Based on the jury's answers to the special issues set forth in Texas Code
of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced
appellant to death. (2) Direct appeal to this Court is automatic. (3) After reviewing appellant's
fourteen points of error, we find them to be without merit. Consequently, we affirm the trial
court's judgment and sentence of death.

FACTS


 On October 6, 2002, appellant stopped at a gas station and food mart in Ferris, Texas. 
When he entered the store to make his purchases he had a shotgun hanging from his shoulder. 
A short time after returning to his vehicle, appellant fired his weapon in the direction of two
men at a pay telephone on the premises. Startled by the shot, another customer, Brad Carroll,
asked appellant if he was "okay." Appellant responded that the gun was not real and asked
Carroll if he would help him get his car started. Carroll agreed and pulled his truck in front
of appellant's car to use booster cables. While appellant was working on his car, Carroll
noticed several boxes of buckshot in appellant's vehicle, determined that the gun was real,
and decided to leave. As Carroll drove away, he heard another gun shot. When he turned
to look, he saw a bleeding man lying on the ground, and appellant was pointing his shotgun
in the man's direction. Just after he left the property, Carroll saw a police officer's car pull
into the station. He then heard two more shotgun blasts and pistol fire.

 While waiting to get diesel gasoline, Brandon O'Neill saw appellant working on his
vehicle and Pedro Moreno filling his truck with gas. O'Neill noticed that appellant appeared
to speak to Moreno, but Moreno did not respond. Appellant then reached into his vehicle,
pulled out a gun, and shot Moreno.

 In response to a 911 call, Officer Harry Marvin Steinfeldt, III, dressed in a police
uniform and driving a police vehicle, responded to the shooting at the gas station. When he
arrived at the station, Steinfeldt first noticed Moreno on the ground and then turned toward
appellant's car, at which time appellant shot Steinfeldt twice. Steinfeldt returned fire after
he hit the ground. After Steinfeldt collapsed, appellant walked to the side of the food mart. 
As appellant was walking, a second officer, Brad Lindsey, arrived on the scene and managed
to take him into custody without further incident.

 Moreno and Steinfeldt both died from their injuries. Several witnesses stated that
appellant showed no emotion and was rather nonchalant throughout the incident. In the
ambulance on the way to the hospital to receive treatment for the wounds he suffered in the
exchange of gunfire, appellant gave his name and address to the officer accompanying him. 
Appellant then stated several times without prompting that he had killed an undercover
officer at the gas pumps and had shot a second officer in uniform.

 The doctor who treated appellant thought that he was under the influence of drugs
when he was admitted, and subsequent testing revealed that appellant had ingested
methamphetamines within the forty-eight hours preceding his arrival at the hospital. A
trauma nurse who attended to appellant at the hospital stated that appellant was belligerent,
swearing, and uncooperative regarding the medical care he was receiving. She also stated
that appellant repeated that "two cops got whacked."

 In response to the State's case on guilt, appellant called several witnesses who
testified to his non-violent nature, but who also opined that appellant was mentally ill. One
witness, who claimed to know appellant "pretty well," testified that he never acted in a
violent manner. However, some things that appellant had told her made her suspect that he
was mentally ill long before the instant offense occurred. She stated that appellant had been
hospitalized at one point and had told her that he saw dead people. She also often saw
appellant talking to himself. Another witness, who had known appellant's family for forty
years and had spent a couple of weeks with them every year around Easter, stated that
appellant behaved very differently from normal during Easter 2002-he had bursts of anger,
saw things that did not exist, heard voices giving him commands, and said that everyone was
out to get him.

 Appellant's mother testified that appellant's behavior began to change around
Christmas 2001. She stated that he was frightened and upset, thought that people were
talking to him through the television, and thought that the CIA and FBI wanted to kill him. 
Appellant's mother was so concerned that, around April or May 2002, she had appellant
committed to a mental hospital when he refused to see a doctor on his own, but he was back
out on the street after seventy-two hours. She noted that appellant's condition only worsened
after that time.

 Dr. Jaye Douglas Crowder, a psychiatrist appointed to examine appellant, testified that
he interviewed appellant several times, as well as appellant's friends and family members. 
Crowder testified that appellant was psychotic each time he was interviewed. He also stated
that appellant had an extensive history of psychotic behavior and delusional thinking. 
Crowder opined that, on the day of the offense, appellant was psychotic, paranoid, believed
people were persecuting him, and did not understand the wrongfulness of his conduct.

 The State called several witnesses to rebut appellant's case. Dr. Chris Bell, a surgery
resident who treated appellant at the hospital on October 6, 2002, testified that appellant
admitted using cocaine and amphetamines, and subsequent testing confirmed that
amphetamines, methamphetamines, and cannabis were in appellant's system. Bell also
testified that, while he felt appellant was under the influence of drugs when he was admitted
to the hospital, he did not have the same impression when he talked to appellant later that
week.

 Dr. Lisa Clayton, a psychiatrist, testified that she interviewed appellant and that he
exhibited no signs of psychotic behavior during the interview. In fact, appellant told her that
he was not really paranoid. She ultimately concluded that appellant was not insane at the
time of the murders. Clayton did not talk with appellant's friends or family members.

 Two detention officers at Ellis County Jail testified that they had regular contact with
appellant during his incarceration, and they never saw him agitated, pacing, or talking to
himself. The nurse at the jail testified that appellant received antibiotics and pain medication,
and just prior to trial, he received an antidepressant and sleep aid. She also testified that
there was a period of time during which appellant was prescribed a drug that she thought was
an anti-psychotic medication; however, she never saw appellant agitated, pacing, or
muttering to himself.

 Finally, Dr. Richard Rogers, a forensic psychologist who had written a book about
conducting insanity evaluations, testified that he spent approximately eleven hours with
appellant while evaluating him. Rogers testified that the most likely diagnosis for appellant
at the time of the murders was a substance-induced psychotic disorder with paranoid
delusions, and he opined that appellant understood the wrongfulness of his acts on October
6, 2002. Rogers admitted that he had not talked to appellant's friends or family members and
admitted that he was not aware that appellant behaved strangely in the days before the
murders. Nonetheless, he opined that, despite appellant's mental illness, his psychosis did
not manifest itself on the day of the murders and, therefore, did not prevent appellant from
understanding that his conduct was wrong.

 At punishment, the State called former Ellis County Deputy Sheriff Adam Irwinsky
who testified that he and his trainee were called out to appellant's home on July 22, 2002,
with regard to a "disturbance with possibly a gun involved." When Irwinsky asked appellant
to step outside, appellant responded that he would not come out because they would jump
on him. Irwinsky assured appellant that they would not jump on him, and appellant laid
down a .357 magnum handgun he was holding and came out. Appellant told the officers that
he and his parents were having an argument that day. No arrests were made, no guns were
seized, and appellant did leave the premises with a friend.

SUFFICIENCY OF THE EVIDENCE


 Appellant claims in his fourth point of error that the evidence presented at trial was
legally insufficient to support the jury's finding that he would be a continuing threat to
society. (4) Specifically, appellant argues that "[t]here was not one scintilla of evidence outside
of the offense itself that dealt with the probability that [he] would be a future danger." In
reviewing the sufficiency of the evidence at punishment, this Court looks at the evidence in
the light most favorable to the verdict to determine whether any rational trier of fact could
have believed beyond a reasonable doubt that there is a probability that appellant would
commit criminal acts of violence that would constitute a continuing threat to society. (5)

 Viewed in the light most favorable to the verdict, the evidence presented at trial of the
instant offense showed that appellant, without hesitation or emotion, shot one person he
decided was an undercover police officer and a second person he knew was a police officer. 
He then repeatedly professed to various individuals that he had shot two officers. The
evidence also showed that appellant had ingested drugs prior to the offense and was mentally
ill.

 Further, despite appellant's claims to the contrary, evidence of the crime itself was not
the only evidence presented. During the guilt phase of trial, appellant presented quite a bit
of evidence concerning the mental illness from which he allegedly suffered. Although
presented as an insanity defense for this crime, a rational jury could have concluded that
appellant's illness would affect his later behavior and cause him to behave in a manner that
constituted a threat to society - both in prison and in free society. (6) The same conclusions can
be drawn concerning appellant's drug use and any combination of his drug use and his
mental illness. Also, the State presented evidence completely apart from the instant offense
showing that officers had been called to appellant's house when he was acting in a
threatening manner toward his family. Given this presentation, we hold that the evidence is
legally sufficient to support the jury's affirmative answer to the future-dangerousness issue. 
Point of error four is overruled.

 In point of error fourteen, appellant asserts that the evidence is insufficient to support
the jury's "no" answer to the mitigation question. This Court does not conduct such a
sufficiency review. (7) Point of error fourteen is overruled.

EXPERT TESTIMONY


 In his first point of error, appellant complains that the trial court erred in allowing
expert testimony without first providing him proper notice. Appellant asserts that this error
harmed him and violated his due process rights under the federal and state constitutions. 
Appellant makes a three-part complaint. First, appellant complains that A.P. Merillat, senior
investigator for the special-prosecution unit in Huntsville, was allowed to testify as an expert
even though he was not designated as an expert. Second, appellant asserts that the lack of
notice deprived him of the ability to prepare. Third, he complains that the lack of notice
deprived him of an opportunity to file a challenge to the expert.

 The pretrial order issued by the judge of the trial court in every criminal case in his
court required both the State and the defense to give notice of any expert, without written
request from the opposing party, not later than the 20th day before the date the trial was to
begin. This notice was to include the witness's area of expertise and a brief summary of the
witness's conclusions. At the punishment phase of trial, appellant conceded that Merillat had
been listed on the regular witness list; however, he complained that Merillat was not
designated as an expert even though the testimony the State sought to elicit from him was
that of an expert, i.e. specialized knowledge gained through practical experience in his
employment as a peace officer. Appellant specifically objected that he did not get notice that
Merillat was an expert. Therefore, he asserted that he was not able to prepare or to file a
challenge to the witness. The court noted that the hearing the court was about to hold
regarding appellant's objection to the witness constituted a "challenge" to the witness.

 During the hearing, which was held outside the presence of the jury, Merillat testified
that he was a peace officer who worked as a senior criminal investigator for the special
prosecution unit out of Huntsville. He explained that the office was charged with the
responsibility for prosecuting all crimes that occur within the prison system, crimes that are
committed by employees of the prison system, and crimes committed in the free world but
that originated from a conspiracy within the prison. He explained the general classification
system within the prison and the potential for and existence of violence within that system. 
Merillat also specifically noted that inmates sentenced to life in prison after a conviction for
capital murder: were not segregated from other inmates; were not restricted any more than
other prisoners from moving to and from their cell blocks to other areas of the prison; were
not labeled as capital murderers in any way; had access to doctors, nurses, and teachers; and,
had visitation rights.

 After the hearing, the trial court agreed that much of the testimony the State sought
to elicit was expert testimony, and the State's failure to designate the witness as an expert
barred the testimony in this case. In light of this finding, the court had the court reporter
prepare a rough transcript of the proceedings, and the judge thereafter marked those
questions that he determined were "fact" questions and, therefore, not expert testimony. 
Appellant renewed his "previously stated" objection to the testimony. Merillat was then
allowed to testify in front of the jury regarding only those questions the court had marked as
"fact" questions. Merillat gave his name and described his job. He then testified that capital
murderers who receive a life sentence: are not segregated from other inmates; are not
restricted any more than other prisoners from moving to and from their cell blocks to other
areas of the prison; are not labeled as capital murderers in any way; have access to doctors,
nurses, and teachers; and, have visitation rights.

 Appellant fails to note in his brief that his objection to Merillat's testimony was in
large part sustained. He also fails to specifically argue how any of the court-permitted
questions elicited expert testimony. In fact, during final argument, defense counsel stated
that Merillat "said there are prisons and there are rules" and "[the witness] didn't bring you
anything you didn't already know by watching the news." By this argument, counsel, in
effect, told the jury and the court that he did not believe the remaining testimony amounted
to expert testimony.

 Further, to the extent that the "fact" questions the court allowed did elicit expert
testimony, the testimony did not harm appellant. Appellant conceded that Merillat was listed
as a regular witness, and appellant was afforded an opportunity to challenge the witness
through a hearing. Appellant could have contacted Merillat to attempt to gauge the substance
of his testimony, and appellant could have attempted to get his own witness to counter
Merillat's testimony. Finally, appellant could have asked for a continuance to investigate the
matter. Appellant's first point of error is overruled.

 APPELLATE COUNSEL


 Appellant complains in his second point of error that his federal and state
constitutional rights were violated when the trial court did "not appoint[] counsel for appeal
pursuant to Article 26.052(k) of the Texas Code of Criminal Procedure and such error denied
meaningful review on appeal." Appellant's argument is three-fold. First, appellant argues
that counsel was not properly appointed under Article 26.052(k). Second, because counsel
was not properly appointed under the statute, appellant was deprived of counsel during the
critical thirty-day period after sentencing in which counsel could have filed a motion for new
trial and developed the record concerning any claims of ineffective assistance of counsel. 
Finally, because counsel could not develop the record regarding any ineffective assistance
claims, appellant was deprived of the opportunity of raising these claims on appeal. A
recitation of the applicable law and the facts involved will be helpful to a resolution of the
issue.

 Article 26.04 sets out the procedures for appointing counsel in criminal cases. Article
26.04(j)(2) states that an attorney appointed under this article shall:

 represent the defendant until charges are dismissed, the defendant is acquitted,
appeals are exhausted, or the attorney is relieved of his duties by the court or
replaced by other counsel after a finding of good cause is entered on the
record.


Article 26.04(a) provides that any procedures adopted under this article must be consistent
with the procedures outlined in other articles, including Article 26.052, which governs the
appointment of counsel in death-penalty cases. The pertinent parts of Article 26.052 provide
that:

 (j) As soon as practicable after a death sentence is imposed in a capital felony
case, the presiding judge of the convicting court shall appoint counsel to
represent an indigent defendant on appeal and to apply for a writ of certiorari,
if appropriate.


 (k) The court may not appoint an attorney as counsel on appeal if the attorney
represented the defendant at trial, unless: 


 (1) the defendant and the attorney request the appointment on the
record; and 

 (2) the court finds good cause to make the appointment.


 Less than two weeks after the commission of the instant offense, attorneys James R.
Jenkins and Joe Gallo were appointed to represent appellant at trial. According to the
standing pretrial order issued by the court, defense counsel were expected to, among other
things, "[i]n the event of conviction, appeal or file a written Waiver of Appeal." On
February 26, 2004, appellant was convicted by a jury and sentenced to death, and on March
23, Jenkins and Gallo filed a notice of appeal and designated the record on appeal. No
motion for new trial was filed in the thirty days after sentencing.

 Without complaint from appellant, Jenkins, or Gallo, the appellate timeline proceeded,
and defense counsels' brief was initially due in this Court on September 2, 2004. On August
30, citing to the length of the record and the complexity of the issues involved, counsel
requested a 120-day extension on the filing deadline. This Court granted the request and set
a new due date of January 3, 2005. However, on November 4, 2004, more than two months
after they filed their request for an extension, Jenkins and Gallo filed in the trial court a
motion to substitute counsel. They asserted in the motion that they had just been made aware
of Article 26.052. Specifically, they noted that Article 26.052(k) states that the trial court
cannot appoint as appellate counsel the same counsel that represented a defendant at trial
unless other enumerated conditions were met. Counsel asserted in their motion for
substitution that these conditions had not been met. They also asserted that continuing as
appellate counsel would not be in appellant's best interest because they were not appellate
specialists. On November 12, 2004, acknowledging the problem of allowing Jenkins and
Gallo to continue representing appellant, the trial court granted the motion to substitute
counsel and appointed attorney Mark Griffith to take their place.

 On December 1, 2004, Griffith filed in this Court a "Motion to Abate Appeal and
Request for Leave to File Motion for New Trial." In the motion, Griffith claimed that, had
he been appointed immediately after appellant was convicted and sentenced as required by
Article 26.052, he would have filed a motion for new trial within the thirty-day period
provided for such a filing. Noting that one of the purposes for filing a motion for new trial
is to adduce facts not in the record for purposes of appeal, (8) counsel argued that, having
reviewed the reporter's transcript of the trial, said transcript shows "a very real possibility
of ineffective assistance of counsel during the trial of this case." Specifically, he pointed out
that, during the penalty phase of trial, "counsel did not call any witnesses and only briefly
cross-examined one of the three witnesses called by the State." He asserted that he should
have been given the opportunity by way of an out-of-time motion for new trial to investigate
and adduce facts not in the record regarding any claim of ineffective assistance of counsel.

 Given this framework, we can now return to the point of error raised on direct appeal. 
Appellant first argues that the appointment of appellate counsel was in violation of Article
26.052(k). Article 26.052(k) does not expressly forbid the appointment of trial counsel to
continue as appellate counsel. It does require certain conditions be met, though, before such
appointment is allowed. These conditions were not met in this case. Therefore, the court did
initially violate the dictates of Article 26.052(k) in requiring counsel to continue their
appointment on appeal. (9)

 Appellant next asserts that this error resulted in harm to him because he was deprived
of counsel during the critical thirty-day period after sentencing in which counsel could have
filed a motion for new trial. Specifically, he asserts that, because he was deprived of counsel,
he was deprived of the opportunity to raise properly developed ineffective-assistance claims
on appeal. Contrary to appellant's claim, he was not deprived of counsel during the period
of time in which counsel could have filed a motion for new trial. First, Article 26.052 states
that the trial court shall appoint counsel on appeal, "[a]s soon as practicable after a death
sentence is imposed," without specifying a time limit. Second, whether properly appointed
under the statute or not, qualified counsel did represent appellant during the period of time
in which a motion for new trial could have been filed. Neither the fact that they did not file
a motion for new trial nor that new counsel might have raised an ineffective-assistance claim
in such a motion changes the fact that appellant was not deprived of counsel during this
period.

 Likewise, appellant's assertion that he was deprived of the opportunity of raising
properly developed ineffective assistance claims on appeal does not amount to harm resulting
from the trial court's error under Article 26.052. Griffith argued in his motion to abate the
appeal that he could and would have raised ineffective assistance of counsel in a motion for
new trial. He came to this conclusion after reviewing the record in the case and reflecting
on counsels' performance at trial. However, the reporter did not finish transcribing the
record in the case until summer 2004-more than sixty days after the time had expired to file
a motion for new trial. Therefore, had Griffith been appointed during the period in which
he could have filed a motion for new trial, he would not have had the benefit of the written
record on which to base his motion.

 Given the circumstances, the record does not show that appellant was harmed by the
trial court's initial violation of Article 26.052(k). (10) Point of error two is overruled.

CONSTITUTIONALITY


 Appellant asserts in his third point of error that the death penalty as applied in this
case violates the Eighth Amendment to the United States Constitution because, due to his
mental illness, he suffered from a disability in reasoning, judgment, and control of his
impulses. Therefore, as with the mentally retarded, appellant argues, the State should be
barred from executing him under Atkins v. Virginia, 536 U.S. 304 (2002). However, neither
this Court nor the United States Supreme Court has extended the holding in Atkins to protect
the mentally ill, and we will not do so in this case. Appellant's third point of error is
overruled.

 In his fifth point of error, appellant asserts that the death penalty scheme is
unconstitutional because it fails to provide a meaningful appellate review of mitigating
evidence or a re-weighing of aggravating and mitigating circumstances. Appellant also
asserts that the statute is unconstitutional because Texas law does not provide for a
comparative proportionality review. The arguments appellant makes in his multifarious point
of error have been previously raised and rejected by this Court. (11) Appellant raises no novel
argument or otherwise persuades us to revisit these holdings.

 Appellant also asserts in his fifth point of error that there is no meaningful review of
the future dangerousness issue due to this Court's ruling in Martinez v. State, (12) wherein the
Court found the future dangerousness evidence legally sufficient based only on the facts of
the crime. Again, appellant has failed to make a novel argument or otherwise persuade us
to revisit this holding. Appellant's fifth point of error is overruled.

 In his sixth point of error, appellant asserts that Article 37.071's "definition of
'mitigating evidence' is facially unconstitutional because it limits the Eighth Amendment
concept of 'mitigation' to factors that render a capital defendant less morally 'blameworthy'"
for the commission of a capital murder. We have previously rejected this argument. (13) Point
of error six is overruled.

 Appellant argues in his seventh point of error that Article 37.071 is unconstitutional
because the aggravating factors used in the statute are vague and do not properly channel the
sentencer's discretion. Specifically, appellant asserts that the terms "probability," "criminal
acts of violence," and "continuing threat to society" should be defined. This Court has
previously decided this claim adversely to appellant. (14) Point of error seven is overruled.

 In point of error eight, appellant contends that the mitigation issue is unconstitutional
under the Eighth and Fourteenth Amendments because it permits the very type of open-ended
discretion condemned by the United States Supreme Court in Furman v. Georgia, 408 U.S.
238 (1972). This Court has addressed and rejected this issue. (15) Appellant's eighth point of
error is overruled.

 In his ninth point of error, appellant asserts that the capital-sentencing statute is
unconstitutional because it fails to require that jurors be informed that a single holdout juror
on any special issue would result in an automatic life sentence. We have previously decided
this issue adversely to appellant. (16) Appellant's ninth point of error is overruled.

 In his tenth point of error, appellant asserts that the "10/12" rule of Article 37.071
violates the constitution. This Court has previously considered and rejected this claim, and
appellant has given us no reason to reconsider it here. (17) Appellant's tenth point of error is
overruled.

 In his multifarious eleventh point of error, appellant contends that the death penalty,
as it is presently administered, amounts to cruel and unusual punishment because: (1) it
simultaneously restricts and allows unlimited or "open-ended" juror discretion to impose the
death penalty; and (2) the drugs used in lethal injection cause unnecessary cruelty, suffering,
and pain. In his twelfth point of error, appellant makes the same argument under the Texas
Constitution. This Court has addressed and rejected the complaint regarding open-ended
juror discretion. (18) As to the second complaint, appellant has failed to provide anything other
than references to general articles and studies. He has provided nothing regarding the
protocol to be used in his situation. Thus, appellant's claim is not sufficiently developed, and
we cannot address it. (19) Furthermore, the method in which the lethal injection is currently
administered is not necessarily determinative of the way it will be administered in the future. 
Appellant's eleventh and twelfth points of error are overruled.

 In his thirteenth point of error, appellant claims that the mitigation question submitted
to the jury pursuant to Article 37.071, section 2(e), is unconstitutional because the statute
does not require the State to prove beyond a reasonable doubt that there was insufficient
mitigating evidence to support a life sentence. We have previously rejected this claim and
appellant has given us no reason to revisit the issue here. (20) Appellant's thirteenth point of
error is overruled.

 We affirm the judgment of the trial court.


Delivered: January 31, 2007

Do Not Publish
1. Tex. Penal Code Ann. § 19.03(a).
2. Tex. Code Crim. Proc. art. 37.071, § 2(g). Unless otherwise indicated, all references to
Articles refer to the Code of Criminal Procedure.
3. Art. 37.071, § 2(h).
4. See Art. 37.071, § 2(b)(1). 
5. Ross v. State, 133 S.W.3d 618, 621 (Tex. Crim. App. 2004) (applying Jackson v. Virginia,
443 U.S. 307 (1979), standard to review evidence on "future dangerousness" punishment issue); see
also Allridge v. State, 850 S.W.2d 471, 487 (Tex. Crim. App. 1991). 
6. See, e.g., Penry v. Lynaugh, 492 U.S. 302 (1989)(recognizing that the same evidence could
be considered both aggravating and mitigating).
7. Russeau v. State, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005), cert. denied, 126 S.Ct. 2982
(2006); McGinn v. State, 961 S.W.2d 161 (Tex. Crim. App. 1998).
8. See Tex. R. App. P. 21.2.
9. Although appellant asserts that the harm caused was of constitutional dimension, we note
that the failure to adhere to statutory procedures that serve to protect a constitutional provision is a
violation of a statute, not a violation of the constitutional provision itself. See Hughes v. State, 24
S.W.3d 833, 837 n.2 (Tex. Crim. App. 2000); Ex parte Long, 910 S.W.2d 485, 486 (Tex. Crim. App.
1995).
10. Tex. R. App. P. 44.2(b)
11. See Russeau, 171 S.W.3d at 886 (noting that we have rejected the claim that refusing to
review the sufficiency of mitigating evidence deprives a defendant of "meaningful appellate
review"); McGinn, 961 S.W.2d at 170 (noting that Texas is not a "weighing" state; therefore, a
reviewing court does not re-weigh mitigating and aggravating factors on appeal); Ibarra v. State, 11
S.W.3d 189, 198 (Tex. Crim. App. 1999)(holding that the Due Process Clause does not require a
comparative proportionality review). 
12. Martinez, 924 S.W.2d 693 (Tex. Crim. App. 1996).
13. See Blue v. State, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003), cert. denied, 543 U.S.
853 (2004).
14. See Blue, 125 S.W.3d at 505.
15. See Moore v. State, 999 S.W.2d 385, 408 (Tex. Crim. App. 1999).
16. See Russeau, 171 S.W.3d at 886.
17. See Escamilla v. State, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004), cert. denied, 544 U.S.
950 (2005).
18. See Escamilla, 143 S.W.3d at 828. 
19. See Bible v. State, 162 S.W.3d 234 (Tex. Crim. App. 2005).
20. See Perry v. State, 158 S.W.3d 438, 446-47 (Tex. Crim. App. 2004), cert. denied, 126 S.Ct.
416 (2005).