

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-75,707

### CHRISTOPHER DEVON JACKSON, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. 1056372 IN THE 230th DISTRICT COURT
### HARRIS COUNTY

**KELLER, P.J., delivered the opinion of the Court in which MEYERS, JOHNSON, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. WOMACK, J., joined except as to points of error one and two. PRICE, J., concurred.**

On December 5th, 2005, appellant shot and killed Eric Smith after stealing Smith's common-law wife's SUV. Smith was killed by a single shotgun blast to the back of the head. Appellant was arrested the next day. In April 2007, appellant was convicted of capital murder and sentenced to death.[1] Direct appeal to this Court is automatic.[2] Appellant raises nine points of error. Finding no

---

[1] TEX. PENAL. CODE §19.03(a); TEX. CODE CRIM. PROC. art. 37.071. Unless otherwise
(continued...)

reversible error, we affirm the conviction and sentence.

## I. GUILT

### A. Photographs

In point of error six, appellant contends that the admission of photographs depicting the victim at the crime scene and during the autopsy violated Texas Rule of Evidence 403.[3] He complains that the photographs depicted brain tissue, blood flow patterns, bloody clothes, and exposed limbs and that some of the photographs depicting brain tissue were "very graphic."[4]

A trial court may consider several factors when determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, including the number of photographs, their gruesomeness, their size, whether they are color or black and white, the

---

(...continued)
indicated, all future references to articles refer to the Code of Criminal Procedure.

[2] Art. 37.071, §2(h).

[3] TEX. R. EVID. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

[4] Appellant refers to exhibit numbers and quotes from the record, but he does not provide the actual record references. Although appellant has probably conveyed enough information to enable this Court to locate the portions of the record relied upon, the provision of record references would make such an effort easier. Fortunately, the State provided the relevant record references in its brief. We need not decide whether appellant has failed to comply with his duty to provide "citations . . . to the record" under TEX. R. APP. P. 38.1(h) in this instance, but we caution that a party should always provide the volume and page numbers for any material from the record upon which the party relies.

availability of other means of proof, and other circumstances unique to the individual case.[5]

Photographs are neither cumulative nor lacking in significant probative value simply because they

merely corroborate other kinds of evidence.[6] Also, the gruesomeness of the subject matter depicted

in a photograph does not render the photograph inadmissible if it merely reflects the reality of the

brutal crime committed.[7] Appellant relies heavily on *Erazo v State*[8] and *Reese v. State*,[9] but those

cases are distinguishable because they involved photographs of victims not named in the

indictment,[10] which is not at issue here.

The photographs in the instant case related solely to the victim of the charged offense.

Although some of the photographs contained gruesome depictions of the victim's head injuries, these

and the other photographs simply reflected the brutality of the offense.[11] Point of error six is

overruled.

## B. "Voluntariness" Jury Instruction

---

[5] *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995).

[6] *Chamberlain v. State,* 998 S.W.2d 230, 237 (Tex. Crim. App. 1999); *Williams v. State*, 937 S.W.2d 479, 488 (Tex. Crim. App. 1996).

[7] *Sonnier*, 913 S.W.2d at 519.

[8] *Erazo v. State*, 144 S.W.3d 487 (Tex. Crim. App. 2004).

[9] *Reese v. State*, 33 S.W.3d 238 (Tex. Crim. App. 2000).

[10] *See Prible v. State*, 175 S.W.3d 724, 736 (Tex. Crim. App. 2005)(citing *Erazo*); *Erazo*, 144 S.W.3d at 494 (distinguishing photographs discussed in other cases "because they showed wounds suffered by the victim (or victims) for whose death the defendants were on trial or demonstrated elements that the State or plaintiff was required to prove to obtain a conviction or judgment").

[11] *See Chamberlain*, 998 S.W.2d at 236-37 (photographs depicting gruesome head injuries not unfairly prejudicial under Rule 403).

In point of error three, appellant contends that the trial court erred when it refused to submit a jury instruction on the issue of voluntariness under article 38.22, §6. He argues that the testimony of Sergeant Brian Harris showed that appellant's confession was involuntary because Sergeant Harris promised appellant that he would be able to avoid the death penalty if he gave inculpatory statements.

Appellant relies upon the following testimony at the hearing on the motion to suppress:

Q: So, you are telling him on the tape that if he will be honest with you and tell you about this shooting, that that is the only way he can get mercy to work right?

A: That would be the only way for mercy to possibly have a chance to work.

Q: Okay. Well, if he did what you asked him and told you what happened during the shooting, it's not very merciful that you turn around and seek the death penalty, is it?[12]

Appellant's brief cites only to the motion-to-suppress hearing and does not discuss, or provide a citation to, any testimony before the jury. Article 38.22, §6, contemplates that evidence contesting the voluntariness of a statement be introduced in front of the jury before a voluntariness instruction

---

[12] This small passage quoted by appellant occurs within a larger colloquy that sheds further light on the nature of Sergeant Harris's testimony. We need not discuss that larger colloquy because, as will be explained below, the portion of the record that is relevant to appellant's claim occurs later, during the presentation of evidence to the jury.

is required.[13]  An appealing party has the duty to cite to the relevant portions of the record.[14]

Appellant's claim is inadequately briefed and subject to rejection on that ground alone.

Nevertheless, since the State has cited to the pertinent portion of the testimony before the

jury, we will, in the interest of justice, address appellant's claim in light of that testimony.  We set

out the relevant portions of the record:

> Q: What was it that you spoke to the defendant about, the theme of justice and mercy?
>
> A: Okay.  Basically, the conversation about my portion in the conversation of justice and mercy, I tell the person, what is the definition of justice?  And when I hear that person's definition, I then come back and refer to them my definition of justice.  And that definition being: Justice equals people getting what they deserve.  Again, then I talk to some people (sic) confuse it with revenge and other things like that.  But that justice was people getting what they deserved.  And then that leads into a portion of my conversation where I say, I don't believe that we live in a society of justice, that we don't get what we deserve.  And then I thank you God every day that we don't live  in a society of justice because this would be a very hard place to live if we all got what we deserved for things that we have done, thought, or said to people.  And that leads into the next portion of mercy.
>
> * * *
>
> Q: And what do you talk to him about mercy?
>
> * * *
>
> A: I share with them that mercy is not so much giving people what they want but

---

[13]  *Oursbourn v. State*, 259 S.W.3d 159, 175 (Tex. Crim. App. 2008)("a party may offer evidence before the jury suggesting that the confession was not in fact voluntary . . . if such evidence is offered before the jury, the trial judge shall give the jury a voluntariness instruction"); *Vasquez v. State,* 225 S.W.3d 541, 545 (Tex. Crim. App. 2007)("the defense is still required to introduce evidence at trial from which a reasonable jury could conclude that the statement was not voluntary"); art. 38.22, §6 ("evidence pertaining to such matter may be submitted to the jury and it shall be instructed . . . .").

[14]T EX. R. APP. P. 38.1(h)("The brief must contain . . . appropriate citations . . . to the record.").

people what they need, and then I go into a – at that time or what I thought was a popular movie a conversation about a movie to demonstrate what mercy is and we talk about the movie *Bruce Almighty* and a character named Jim Carey.

Q: I've never seen that movie. Tell the members of the jury what it is that you talk about in that movie.

A: In the movie *Bruce Almighty*, the character Jim Carey is given the powers of God. And a portion of that conversation that I share with them is that he has power to answer everyone's prayers. And so, he says he is going to give everyone what they want. And there is a computer where all the prayers are, and he hits a button saying, yes, to everybody's prayer. And in one particular prayer, we discuss about how there are thousands of people that pray to win the lottery and they all win the lottery. But the day they're walking around with a miserable buck 17, you know, and some loose change in their pocket. And then I stress to them, they all got what they wanted. They won the lottery. But what was it that they needed? And then the point is made that many times as people we may think we know what we want, but we don't know how to ask for what we need.

\* \* \*

Q: Did you tell him that whole spiel you have on justice and mercy and even talk about *Bruce Almighty*?

A: Yes, and then some other things.

Q: Okay. What were some of the other things that you spoke to the defendant about?

A: Yes. Once I spoke to him about what mercy was, I then explained to him that in order for him to get what he needed, which was not to be looked upon as a vicious animal, but rather a person, he needed somebody that could help explain that. I also told him that in order for mercy to work, it stands on truth, a hundred percent truth. That mercy can't work, it's like a chair with four legs. It's solid, and it's sturdy. And mercy can only work when all four legs are like truth. That if there is one lie, then mercy can't work. There will be no balance. It will fall apart. And when somebody tries to abuse or manipulate mercy, then there is only one choice left and that's for justice to kick in and justice being, people getting what they deserve.

\* \* \*

Q: What were some of the additional things that you explained to him?

A: Various elements of crimes.

\* \* \*

Q: Did you make him any promise? Did you threaten him in any way to get him to do that [talk on tape]?

A: No and no.

A claim under article 38.22, section 6 focuses on whether the accused's statement was actually involuntary, and such an inquiry may include consideration of police overreaching, youth, intoxication, illness or medication, mental incapacitation, or other disabilities.[15] A promise can render a confession involuntary if the promise is "positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully."[16]

There is no evidence that Sergeant Harris made a positive promise to appellant. At most, the evidence shows that the sergeant indicated that appellant could not hope to obtain mercy if he was not truthful, but Sergeant Harris spoke of mercy in philosophical terms and never told appellant that mercy would entail lenient treatment from the authorities. Rather, the sergeant's use of the "mercy" theme seemed to be more focused on the morality of telling the truth. Although it is a factor to consider, "moral urging does not in itself render an accused's statement involuntary."[17] Finally, given Sergeant Harris's emphasis on appellant being 100 percent truthful, the interrogation was not of the type that would cause a defendant to speak untruthfully.

Appellant points to nothing else in the record to suggest that his confession was involuntary. Accordingly, we conclude that the trial judge did not err in refusing to submit a jury instruction on the voluntariness of his tape-recorded statement. Point of error three is overruled.

---

[15] *Oursbourn*, 259 S.W.3d at 172-73.

[16] *Bible v. State*, 162 S.W.3d 234, 244 (Tex. Crim. App. 2005).

[17] *Nenno v. State*, 970 S.W.2d 549, 558 (Tex. Crim. App. 1998).

## C.  Closing Argument

In point of error five, appellant complains that the prosecutor's interjection of her opinion during closing arguments required the trial court to declare a mistrial.  The following occurred:

> [PROSECUTOR]: It could have been a drug deal gone bad.  If the defendant robbed Eric Smith and intentionally killed him even if it was a drug deal gone bad, it's still capital murder.  I don't happen to personally believe it was a drug deal gone bad considering all of the circumstances that I know from the witnesses that I spoke to and witnesses --
>
> [DEFENSE COUNSEL]: Objection to the argument that's inserting a personal opinion --
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: We ask for a jury instruction.
>
> THE COURT: The jury will disregard the last statement of the prosecutor.
>
> [DEFENSE COUNSEL]: We move for a mistrial.
>
> THE COURT: Denied.

In determining whether a trial court erred in refusing to grant a mistrial at the guilt stage of trial on the basis of improper argument, we balance three factors: (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of the conviction absent the misconduct.[18]  An instruction to disregard will be sufficient to cure error except in the most extreme of circumstances.[19]  An instruction to disregard will generally cure error even when the prosecutor argues facts outside the record[20] or interjects his personal opinion.[21]

---

[18]  *Hawkins v. State*, 135 S.W.3d 72, 75, 77 (Tex. Crim. App. 2004).

[19]  *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

[20]  *Martinez v. State*, 17 S.W.3d 677, 691 (Tex. Crim. App. 2000); *Guidry v. State*, 9 S.W.3d

(continued...)

The misconduct in this case was not severe. The complained of comment was brief and occurred only on the one occasion mentioned above. The prosecutor did give her personal opinion, but it is not clear whether her allusion was to evidence the jury had heard at trial, or to facts outside the record. The issue on which the prosecutor spoke was collateral; the prosecutor explained that characterizing the incident as "a drug deal gone bad" would not exculpate the defendant of the offense of capital murder. Immediately after the comment, the trial judge instructed the jury to disregard. The first two factors sufficiently favor the trial court's denial of a mistrial in this case, so we need not determine the strength of the evidence supporting the conviction. Under the circumstances, we find that the trial court's instruction to disregard was sufficient to cure the error. Point of error five is overruled.

## II. PUNISHMENT

### A. Texas Youth Commission Infractions

In points of error one and two, appellant contends that the trial court erred in admitting into evidence a summary of disciplinary infractions that he committed while he was incarcerated in Texas Youth Commission (TYC) facilities in 2003 and 2004. Appellant argues that admission of this evidence violated his Sixth Amendment right to confrontation.[22]

---

(...continued)
133, 154 (Tex. Crim. App. 1999).

[21] *See Boyd v. State*, 643 S.W.2d 700, 706-07 (Tex. Crim. App. 1982).

[22] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST., Amend. 6. Defense counsel claimed that the business records exception to the hearsay rule was not met, but he never said on the record that admission of the evidence would violate the Confrontation Clause, though he did make a general statement about "recent Court of Criminal Appeals cases." In its ruling, the trial court referred to *Russeau v. State*,
(continued...)

The summary contained a list of 267 disciplinary infractions allegedly committed while appellant was incarcerated. The infractions listed the location, incident number, date, the date any absconding ended, whether the incident was the subject of a level three hearing, and a brief descriptive label.[23] By way of illustration, we observe that the descriptive labels included "disruption of program," "assault of student/other," "refusal to follow staff instructions," "failure to comply with reasonable request," "danger to others," and "failure to abide by dress code." No commentary or further detail was given about the nature of the incidents. A level three hearing was held on 114 of these incidents.

The TYC records custodian acknowledged that a variety of the descriptive labels could attach to misconduct that was very minor. An assault could include throwing water on someone. Sexual contact could simply mean an inappropriate sexual comment. Disruption of program could be being disrespectful to staff.

Many violations are addressed through a process in which the TYC inmate's peers confront the violator and make him aware that he needs to correct his behavior. Other violations may require a level three hearing, a more formal process of holding the youth accountable. In a level three hearing, a staff member writes up an incident report, the allegation is read to the youth, and the youth

---

(...continued)

171 S.W.3d 871 (Tex. Crim. App. 2005) and to *Ford v. State*, 179 S.W.3d 203 (Tex. App.– Houston [14th Dist.] 2005, pet. ref'd), both of which were Confrontation Clause cases involving the admission of prison disciplinary records. We will assume *arguendo* that error was preserved because the specific ground for appellant's complaint was "apparent from the context." *See* TEX. R. APP. P. 33.1(a)(1)(A).

[23] Each of these categories was in its own column. Two other columns were contained in the summary that were not explained at trial: "Sec/Comm Det/Jail," and "Lev II Sched." No entries were contained in the "Lev II Sched" column. Boxes in the "Sec/Comm Det/Jail" column were either blank or contained the entry "REF" or "SEC."

is given the opportunity to respond regarding whether the allegation is true or not true. The youth can call witnesses and offer evidence on his behalf at this hearing. If the allegation is found to be true, the youth is given the opportunity to appeal, which entails another staff member reviewing the incident and determining whether the hearing officer's finding was correct.

In *Crawford v. Washington*, the United States Supreme Court held that out-of-court "testimonial" statements of a non-testifying declarant could not be admitted unless the declarant was unavailable as a witness and the defendant had a prior opportunity for cross-examination.[24] In *Russeau v. State*, we found that disciplinary reports that described in graphic detail the conduct of an inmate were "testimonial."[25] We held that the admission of such reports into evidence without affording the defendant the opportunity to cross-examine those who allegedly observed his conduct violated the Confrontation Clause.[26]

However, in *Segundo v. State*, we held that "boilerplate" parole revocation certificates "did not contain any such testimonial statements, narratives of specific events, or written observations."[27] We observed that "Texas courts have recognized this distinction between official records that set out a sterile and routine recitation of an official finding or unambiguous factual matter such as a judgment of conviction or a bare-bones disciplinary finding and a factual description of specific

---

[24] 541 U.S. 36, 68 (2004).

[25] 171 S.W.3d at 880.

[26] *Id.* at 880-81.

[27] 270 S.W.3d 79, 107 (Tex. Crim. App. 2008).

observations or events that is akin to testimony."[28]  In saying that "a bare-bones disciplinary finding" was not testimonial, we cited to the Fourteenth Court of Appeals's decision in *Ford v. State*, which upheld the admission of inmate disciplinary records "that contained only a sterile recitation of offenses and the punishments received."[29]

Like *Ford*, the present case involves only the sterile recitation of disciplinary offenses.  At least for the incidents that were the subject of level three hearings, under which at least rudimentary due process protections appear to have been afforded,[30] we hold that the conclusion that appellant committed disciplinary violations and the very brief descriptions of those violations do not constitute testimonial evidence within the meaning of the Confrontation Clause.  With respect to the remaining incidents, we find any error to be harmless because we are convinced beyond a reasonable doubt that those incidents would not create any appreciably greater impact on the jury than would have already been caused by the jury's awareness of the 114 violations for which level three hearings were held.[31]

But even if a Confrontation Clause violation occurred with respect to the 114 incidents that were subject to level three hearings, we would nevertheless find the error with respect to those incidents to be harmless.  Those incidents showed appellant's violent nature and his inability to follow rules, but other evidence at trial indisputably established those characteristics.

---

[28]  *Id.*

[29]  *Id.* at 107 n.9 (citing *Ford*, 179 S.W.3d at 208-09).

[30]  *See Wolff v. McDonnell*, 418 U.S. 539, 563-68 (1974).

[31]   *See* Tex. R. App. P. 44.2(a)("If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.").

Wenshariba Gage, a former girlfriend of appellant, testified that he pointed a gun at her when she tried to end their relationship. Joseph Johnson testified that appellant was one of three people that would "pick fun" and "mess" with him, until one day appellant punched him three or four times in the face. Sherry Menifee, a team leader at a home for troubled or delinquent kids, testified about an incident in which appellant hit a female youth with his fist and pushed Menifee in the chest when she intervened. To subdue appellant during that incident, the staff had to throw him to the floor and handcuff his hands behind his back.

Tashara Sanders, another former girlfriend of appellant, testified that she became pregnant with appellant's child. He told her that he wanted her to get an abortion. Later, knowing Sanders was pregnant,[32] appellant dragged her off a couch and kicked her in the stomach two to three times. On another occasion, appellant broke the windows in Sanders's car. Another time, appellant punched her three times in the face, causing her to fall to the floor. During that incident, he told her that she "better not call the police." Sanders also testified that appellant was a member of the Bloods gang.

On November 26, 2005, an incident occurred with Roy Caldwell. Caldwell testified that he was approached by appellant and another individual. He did not know appellant, but appellant asked him for a cigarette. After he began handing appellant a cigarette, Caldwell became unconscious. He awoke in a hospital six days later, his face heavily damaged by a gunshot wound. He lost an eye, lost feeling in a portion of his face, and could breathe through only one nostril. Caldwell was still taking pain medication for this injury at the time of trial. Appellant had been standing by the side of Caldwell's face that was injured.

---

[32] Sanders was approximately eight weeks pregnant at the time.

The State also introduced evidence that appellant had figured out how to escape from his cell while being held in "super-max" confinement at the Harris County Jail. He had used a piece of a milk carton to defeat the locking mechanism. And while appellant was on trial for capital murder, he told a fellow inmate in the jail that he was going to take the bailiff's gun and "shoot her, shoot his way out." The inmate told the bailiff about this conversation shortly before she was about to open the door to appellant's holdover cell, because he saw appellant running towards the door and was afraid appellant was about to act on his words. And Dr. Willard Gold, a Mental Health/Mental Retardation (MHMR) psychiatrist, testified that appellant attempted to convince personnel that he had a serious mental illness that involved hearing voices. Dr. Gold found that appellant was "malingering."[33]

Defense witnesses confirmed appellant's violent and antisocial behavior. Tommie Walter, appellant's grandmother, testified that appellant's behavior problems "escalated" when her sister, appellant's primary caregiver, died. Appellant then went to live with Walter, but she could not handle his behavior. She tried sending him to counseling, but it did not work. Appellant was disrespectful to her, sometimes talked to her in terrible ways, and sometimes did horrible things to her that she did not deserve. Walter characterized his behavior towards other people as "constant fighting." She acknowledged that appellant had assaulted others at school and in the neighborhood. At some point, he threatened her, and she became afraid of him and called the police. That call caused appellant to be taken from her home. Later, due to assault charges, appellant was taken to TYC.

---

[33] Dr. Gold defined "malingering" as a person who for his own purposes wants to appear psychotic and out of touch with reality, but who really is not. Dr. Gold said that it takes a person who is quite intelligent and clever to try to do that.

Through the defense's own expert witness, Bettina Wright, the State was able to reveal to the jury a number of TYC documents that showed appellant's violent and antisocial behavior. A notation made on January 4, 1999, showed that staff members repeatedly discussed appellant "testing the limits," making threats to TYC staff members, and throwing chairs. A January 5 notation showed appellant had "aggressively tried to close his door against staff to block entry for a safety check" and was "verbally abusive." In another document, the notation was made that appellant "has [a] history of homicidal ideation, fighting at placement homes." A notation in the pediatric admissions nursing notes stated that appellant had "homicidal ideation, no one specific, just when someone makes me mad." Another notation in the nursing notes characterized appellant as saying, "I like to fight and destroy things," and commented that it "appears as though he is trying to intimidate those around him." Another notation stated that appellant "has difficulty taking responsibility for his own behavior." And another note said that appellant's "behavior has been provocative, such as physically blocking people going down the hall." Another note characterized appellant as "manipulative" in his behavior.

Various notes showed numerous instances of misconduct. Appellant deliberately knocked down a peer's toys. He kicked the walls in the hallway and banged on the chair in his room. He refused to follow directions during a fire alarm, and when staff tried to redirect him, he became "combative" and was "fighting, cursing, and threatening." Because another resident "was picking on" appellant and broke his nose, appellant said, "I'm going to use my friend's gun to kill him." Appellant often sang rap songs with inappropriate lyrics that glorify drugs. He refused to complete a homework assignment because he "refused to participate in school." He threw books, used profanity, and then threw chairs down the hall, causing a "code yellow" to be called.

We conclude that the purpose for which the TYC disciplinary records was offered – to show appellant's violent nature and inability to follow rules – was amply demonstrated by other evidence, including from defense witnesses. We conclude beyond a reasonable doubt that any error with respect to the introduction of the TYC disciplinary records did not contribute to appellant's conviction or punishment. Points of error one and two are overruled.

## B. Jail Escort Evidence

In point of error four, appellant contends that the trial court erred in admitting evidence that the use of an "emergency response team" to provide an escort to the courthouse for trial was an occasional but not common occurrence for prisoners and was based upon the risk they posed to themselves and others. Appellant argues that the evidence was irrelevant.

Lonnie Tullis, a deputy with the Harris County Sheriff's Department and a part of the emergency response team, explained that an underground tunnel system connects the jail and the courthouse and that prisoners walk the tunnel and take secure elevators to the courtroom. Usually, prisoners are not physically escorted, but they are monitored by a closed-circuit camera. Sometimes, however, a prisoner poses enough of a risk that he is escorted by the emergency response team. Deputy Tullis testified that appellant was provided such an escort for his trial.

Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[34] One fact of consequence at the punishment stage of a capital murder prosecution is "whether there is a probability that the defendant would commit criminal acts of

---

[34]T EX. R. EVID. 401.

violence that would constitute a continuing threat to society."[35]  That the authorities do not usually

assign a personal escort but believed that appellant needed one has some tendency to make more

probable that appellant is the type of person who would commit criminal acts of violence in the

future.[36]  Point of error four is overruled.

### C.  Child Protective Services and Hospital Records

In points of error seven through nine, appellant contends that the trial court erred in excluding

from evidence records from Child Protective Services (CPS) and from Twelve Oaks Hospital.  He

concedes that the trial court was within its discretion to find that the evidence was hearsay, but he

argues that the exclusion of the evidence violated his Fourteenth Amendment due process right to

present a defense and his Eighth Amendment right to present mitigating evidence in a death penalty

case.  He claims that his case fits under the first scenario of two scenarios outlined by this Court for

when the exclusion of evidence rises to the level of a constitutional violation: when a state

evidentiary rule categorically and arbitrarily prohibits the defendant from offering otherwise relevant,

reliable evidence that is vital to his defense.[37]

"[T]he exclusion of a defendant's evidence will be constitutional error only if the evidence

forms such a vital portion of the case that exclusion effectively precludes the defendant from

---

[35]T EX. CODE CRIM. PROC. art. 37.071, §2(b)(1).

[36]  *See Trevino v. State*, 991 S.W.2d 849, 853-54 (Tex. Crim. App. 1999)(placement in administrative segregation cited as evidence of defendant's future dangerousness).

[37]  *See Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002)(reciting the two scenarios).

presenting a defense."[38] Appellant claims that the CPS records in particular were vital because they documented his "tragic childhood background" and there were no available witnesses to testify regarding the information contained in the records. Appellant does not explain in what manner his childhood background was tragic, nor does he explain what information the records provide that he wished to have admitted into evidence, much less explain why this information could not have been gleaned from other sources. And appellant provides no record citations for this argument. An appealing party has an obligation to set out the facts relevant to his complaints, as well as to cite the pertinent portions of the record.[39] Appellant's claim is inadequately briefed and subject to rejection on that ground alone.

Nevertheless, as with a previous complaint, the State appears to have supplied the missing information, so we will, in the interest of justice, address appellant's claim in light of that information. The CPS records contained hearsay statements from appellant's mother that she did not want appellant, she has never wanted him, appellant was the product of date rape, and she had relinquished her rights to appellant. These statements were excluded by the trial court.

The CPS and hospital records also contained references to various medications. The trial court appears to have been concerned whether certain of the drugs mentioned were actually being taken by appellant: "Well, this looks like just a list of different kinds of drugs. If there is information that he was on those drugs, then fine; but if it's something that just happened to get stuck in here –"

---

[38] *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002).

[39] T EX. R. APP. P. 38.1(f)("The brief must state concisely and without argument the facts *pertinent to the issues or points presented for review*."), (h)("The brief must contain a *clear* and concise argument for the contentions made, with appropriate citations to authorities and *to the record*.")(emphasis added).

then the trial court was going to sustain the objection. The trial court was aware that appellant was taking Zyprexa and ruled the references to that medication to be admissible. But the court invited defense counsel to show the relevance of other medications, or else the trial court would sustain the State's objection. Defense counsel then read from a document that, among other things, said, "Dr. Buttar would like [appellant] to continue on Zyprexa, Depakote, Paxil and have Ativan, if needed for agitation." Apparently distracted by the prosecutor placing the document from which defense counsel was reading in front of her face, the trial court asked, "Zyprexa and what else?" Defense counsel responded, "Depakote, Ativan" and expressed uncertainty regarding a different name for Ativan. The trial court then sustained the State's objection to references to Benzodiazopine and Paxil, but allowed the references to Zyprexa and Depakote.

To preserve error regarding the exclusion of evidence, a party must not only tell the judge that the evidence is admissible, but he must also explain why the evidence is admissible.[40] And the explanation given at trial must match the one urged on appeal.[41] For example, an explanation for admissibility based upon the Rules of Evidence does not preserve a claim that admission of the evidence is required by the Confrontation Clause.[42] Moreover, a defendant's right to present a defense is the type of claim that is forfeited if it is not specifically urged at trial.[43]

In the present case, the State argued that the evidence was hearsay, while the defense argued

---

[40] *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005).

[41] *Id.* at 179.

[42] *Id.*

[43] *Anderson v. State*, 2009 Tex. Crim. App. LEXIS 1612 at 1, 9-11 (November 18).

that the evidence fell within the hearsay exception for medical diagnosis and treatment.[44]  The

defense never argued that admission was required by any provision of the United States or Texas

Constitutions.  Nor did the defense argue that the evidence was crucial to appellant's ability to

present a defense.  With respect to the statements made by appellant's mother, defense counsel

argued just the opposite: "The third reason is that virtually everything that the State objected to is

already in the record anyway by the witnesses that have testified."

And with respect to the drug evidence, another preservation problem arises: The trial judge's

exclusion of references to one of the drugs – Paxil – may have been based on an erroneous

recollection of the record.[45]  Though Paxil was listed as one of the drugs appellant was taking in a

passage that was initially read to the trial court, when asked to repeat the relevant drugs, defense

counsel repeated only "Depakote and Ativan."  Appellant has failed to preserve error for review.

Even if error had been preserved, however, appellant's claims would fail.  Though appellant

was unable to introduce his mother's statements about never wanting him, his grandmother, second

cousin, and uncle testified that his mother did not want her child and had relinquished her parental

rights.  In addition, the defense expert testified that appellant's mother's parental rights had been

terminated.  And as explained above, the trial court did allow evidence of most (if not all) of the

medications appellant was taking.  In addition, the defense expert read from one of the records a

detailed list of some the medications appellant had received and read a notation that appellant was

on a "record-breaking number of psychiatric medications."  Appellant was able to present the

---

[44]  *See* TEX. R. EVID. 801, 802, 803(4).

[45]  *See Loredo v. State*, 159 S.W.3d 920, 923-24 (Tex. Crim. App. 2004)(complaining party has an obligation to correct a trial judge's erroneous recollection of the facts when the erroneous recollection is what motivated the trial court's adverse ruling).

substance of the mitigating-circumstances case to which the excluded evidence related.[46]  The fact

that he was "not able to present his case in the form he desired does not amount to constitutional

error."[47]  Points of error seven through nine are overruled.

We affirm the judgment of the trial court.

Delivered: January 13, 2010
Do not publish

---

[46] *See Valle v. State*, 109 S.W.3d 500, 506-07 (Tex. Crim. App. 2003)(Appellant was able to present his defensive theory through other evidence that contained most of the information contained in the excluded evidence).

[47] *Id.* at 507.