**Opinion issued March 5, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00489-CR

————————————

**JOSHUA MICHAEL KELSEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Case No. 17563550**

---

## MEMORANDUM OPINION

A jury found appellant, Joshua Michael Kelsey, guilty of the felony offense

of murder,[1] and assessed his punishment at confinement for life. In a sole issue,

---

[1] *See* TEX. PENAL CODE ANN. § 19.02(b), (c). The jury found appellant guilty of the murder of three complainants.

appellant contends that the trial court erred in denying his request for a jury instruction on self-defense.

We affirm.

## Background

Timothy Turner testified that he started using narcotics as a teenager. On May 6, 2020, he was with his friend, Lewis Hodges, the first complainant, whom Turner had known for three or four years prior to the first complainant's death. According to Turner, the first complainant was a good person and "[e]verybody liked him." The first complainant weighed about 270 pounds, but he was not intimidating. Turner had never seen the first complainant "become violent with anyone" and had never seen him use a weapon. In May 2020, Turner and the first complainant were both using narcotics "pretty seriously."

Turner further explained that on May 6, 2020, he and the first complainant were "trying to feed [their] addiction." The first complainant wanted "some heroin," and he asked Turner to take him some place to "get some heroin." The first complainant directed Turner to drive to appellant's house.[2]

---

[2] Turner testified that he had known appellant for eighteen years. They did not have "bad blood," and Turner thought that they were "good." Turner noted that he had never gotten violent with appellant, had never threatened appellant, and had never used a weapon on appellant.

Upon arrival at appellant's house, appellant got in Turner's car, which was a four-door Kia Forte, and the group drove "to go get drugs." Appellant gave the directions, and they ended up at a yellow house on Bridgeport Road[3] "where the drugs were supposed to be." The first complainant gave appellant money to go buy narcotics. Appellant then got out of the car and knocked on the door. When no one answered, appellant got back in the car. He handed the first complainant his money back, but it was not the original amount that the first complainant had given him. Eventually, appellant gave the first complainant all his money back and then fell asleep in the backseat of Turner's car. Turner drove to a gas station, about five minutes away, because he wanted to get a beer. When the group arrived at the gas station, appellant received a telephone call which woke him up. After he hung up, appellant told Turner and the first complainant to go back to the yellow house on Bridgeport Road.

Because appellant seemed "a little upset" on the drive back to the yellow house, Turner "decided to give [him] some money" to "keep the pressure down." He also asked appellant to "g[e]t [him] some crack" from the yellow house. The first complainant gave appellant money so that appellant could buy heroin for the first complainant. Appellant then went into the house.

---

[3] Other witnesses testified that Bridgeport Road is in Harris County, Texas.

3

According to Turner, it seems liked appellant was in the yellow house "for over 30 or 40 minutes." And although the first complainant repeatedly called appellant while appellant was inside the house, appellant did not answer. When appellant finally came out of the house, "he didn't look the same." To Turner, it looked like appellant had "just t[aken] a hit." Appellant got in the backseat of Turner's car.

Turner started slowly driving, and he and the first complainant asked appellant where their narcotics were. After driving about 500 feet, Turner pulled his car into a church parking lot.[4] After stopping the car, Turner and the first complainant turned to look at appellant in the backseat, asking him: "Man, what's up? Where's the stuff at?" Appellant avoided the question. When the first complainant asked appellant "[w]here [his] stuff [was] at," appellant "put some brown powdery substance" that "looked like brown sugar" in the first complainant's hand. The first complainant "looked at it" and said, "[M]an, what is this?" Appellant said, "[I]t's your stuff," and the first complainant "blew it in [appellant's] face." Turner told appellant to "quit playing," and appellant said, "All right, man, all right man, I'm going to quit playing with y'all, I'm going to quit playing with y'all. Here go your." (Internal quotations omitted.) And at that moment, appellant pulled out a firearm and hit

---

[4] The church parking lot was also located on Bridgeport Road.

Turner's forehead with the barrel of the firearm. Turner, the first complainant, and appellant immediately jumped out of the car.

Turner explained that when everyone got out of his car, he was on the driver's side and the first complainant and appellant were both on the passenger's side. According to Turner, appellant fumbled with his firearm, and then pointed it at Turner and the first complainant. Turner said to appellant, "[W]hy are you playing with that gun?" And appellant responded, "[O]h, you think I'm playing," and shot the first complainant.[5] Turner started running, and appellant began shooting at Turner.

Turner testified that the first shot that appellant fired at him did not hit him, but appellant fired his firearm again. The second shot hit Turner in the back, and he fell to the ground. Appellant continued to shoot at Turner. Turner saw the first complainant's body lying face down on the ground. Turner got up, and appellant shot him again, hitting Turner in the elbow. Appellant next shot Turner in the wrist. Turner kept running.

At some point, appellant turned his attention back to the first complainant. Turner heard the first complainant yell, and the sound of gunshots. Turner made it to some bushes and hid, but because he was afraid appellant would come after him,

---

[5]     Turner stated that the first complainant was not a threat to appellant. He did not move toward appellant before appellant shot him.

he decided to keep running. He knocked on someone's door and then hid in a shack. Because he thought appellant would be able to find him, Turner decided to run again, and eventually collapsed on the front porch of a house. The people inside the house helped him.[6]

Turner noted that before appellant pulled out his firearm that night, neither he nor the first complainant threatened appellant with any physical bodily harm. Further, neither he nor the first complainant had a firearm or any other weapons on them. Only appellant had a firearm on May 6, 2020. According to Turner, appellant acted like he wanted to kill both the first complainant and Turner when he was shooting at them. Appellant shot the first complainant "because he was high" and because "he didn't want to produce" the narcotics that Turner and the first complainant had paid appellant to get. After appellant killed the first complainant, he killed two other people.

Patricia Pacheco testified that she lived on Kelling Street in Houston, Texas. Michael Miller, the second complainant, was her friend and boyfriend for ten years. She had lived in a house on Kelling Street with the second complainant for more than nine years. Pacheco knew appellant, who was the nephew of one of the second complainant's friends. Appellant would come to the house frequently. At some

---

[6] Other witnesses testified that Turner was found by law enforcement officers and emergency assistance personnel on Foxshire Lane in Harris County, which was near the shooting scene on Bridgeport Road.

6

point, appellant asked Pacheco if he could "put his trailer in [her] backyard and stay there for a while because he didn't have a place to put his trailer." Pacheco told appellant that they could try that arrangement for one month. Although the second complainant did not want appellant to move into the backyard, appellant did so anyways. After about a month, appellant abandoned the trailer, and about six months later, Pacheco donated the trailer because appellant had never come back, and neither she nor the second complainant could not get in touch with appellant. Subsequently, the second complainant ran into appellant, who accused the second complainant of "ma[king] [him] homeless."

Pacheco further testified that on May 6, 2020, sometime after 8:00 p.m., someone knocked on the door of her house. Pacheco started to walk toward the bathroom in the house, while the second complainant answered the door. Pacheco then heard the second complainant say "no" and two gunshots. Pacheco froze. After about two minutes, she walked toward the front door and saw the second complainant lying on the floor. She ran to him to try and help. Because the front door was ajar, she saw a white man with black hair and a beard going toward a silver or gray compact car. She closed the front door so that whoever had shot the second complainant did not come back inside the house, and she called for emergency assistance.

Jose Hernandez testified that he knew Juan Garcia, the third complainant, and he lived at the third complainant's house for about a year when he was seventeen or eighteen years old. On May 6, 2020, Hernandez and his friend, Giovanni Castelan, were dropped off at the third complainant's house.[7] The third complainant was home at the time. After they went inside the house, Hernandez and Castelan sat in the living room talking while the third complainant drank a beer.[8] There was then a knock at the front door, and the third complainant answered it. "Josh," who Hernandez recognized as someone who had been at the third complainant's house before,[9] was at the door. Josh and the third complainant engage in a conversation. "[A]ll of a sudden," Hernandez heard Josh ask the third complainant "if he wanted to see something." Hernandez started to turn his head toward Josh and the third complainant, and as he did so, he heard a gunshot. Hernandez saw the third complainant fall to the ground, and he and Castelan took off running out of the back of the house. They hid in the backyard.

When Hernandez could not hear any noise, he and Castelan snuck back into the house to check on the third complainant. Hernandez called for emergency

---

[7] Other witnesses testified that the third complainant's house was located on Hooper Road in Harris County.

[8] Hernandez testified that the third complainant did not use narcotics.

[9] Hernandez was not able to identify appellant at trial, but he identified the shooter on May 6, 2020 as a person named "Josh."

assistance. As Hernandez performed CPR, blood came out of the third complainant's chest.

Castelan testified that he knew the third complainant, and he was at the third complainant's house on the evening of May 6, 2020. While inside the home, Castelan and Hernandez were "hanging out" and "[h]aving a conversation." The third complainant was drinking alcohol. There was then a knock at the front door, and the third complainant answered it. Appellant, who Castelan had seen around the third complainant's house before, was at the door. Appellant and the third complainant engaged in conversation, until appellant said that "he had something to show" the third complainant. Next, Castelan heard a gunshot, and he ran out of the house to the backyard with Hernandez. Castelan saw appellant run out of the house, get in a light colored four-door car, and drive away.

When Castelan came back into the house, he saw the third complainant lying on the floor. Hernandez called for emergency assistance. When law enforcement officers arrived, Castelan and Hernandez told them that appellant had shot the third complainant.

Houston Police Department Detective J. Caten testified that he was the lead investigator for the shootings of the three complainants. Caten explained that through his investigation he learned that on May 6, 2020, Turner and the first complainant took Turner's car, a silver Kia Forte, and picked appellant up from his

house. Appellant had "set up [a] dope deal," and the group "went to that location." At about 7:55 p.m., appellant went into a house on Bridgeport Road and left Turner and the first complainant outside. The first complainant called appellant's cellular telephone about eleven times between 8:07 p.m. and 8:09 p.m. After "some time," appellant came out of the house and got in Turner's car. Turner started driving, but there was an argument about "the narcotic[s] . . . and the purchase." Appellant "put something" in the first complainant's hand, and then appellant "pulled [a] gun." A surveillance videotaped recording from a home on Bridgeport Road captured the sounds of gunshots and screaming at about 8:12 p.m. Through his investigation, Caten was able to determine that appellant fired eight shots at the scene on Bridgeport Road. Seven of those gunshots hit a person. Caten stated that Turner had been shot in the back, and most of the gunshot wounds on the first complainant were on his back.

Detective Caten further testified that appellant left the scene at Bridgeport Road around 8:12 p.m. or 8:13 p.m. and drove fifteen minutes to the second complainant's home on Kelling Street. Appellant arrived at the house on Kelling Street at about 8:27 p.m. Appellant fired two shots at the scene on Kelling Street, and the second complainant was hit twice.

Appellant then drove to the third complainant's house on Hooper Street. Before appellant arrived at the third complainant's house, appellant's cellular

10

telephone called the third complainant's cellular telephone at 8:53 p.m. The third complainant was shot less than ten minutes later. Appellant fired one shot at the scene on Hooper Street, and the third complainant was hit once. In total, appellant fired his firearm eleven times in the span of about forty minutes on the evening of May 6, 2020. All three shootings were in the same general area of town.

According to Detective Caten, later in the evening on May 6, 2020, around 11:30 p.m., appellant was seen on a surveillance videotaped recording at a gas station driving Turner's silver Kia Forte.[10] After the Kia Forte was located by law enforcement officers, an unfired bullet was found in the backseat of the car where appellant had been sitting. A bullet was also found in the headrest of the car. The same caliber of bullet was found at the scenes on Bridgeport Road, Kelling Street, and Hooper Street.

Chandler Bassett, a firearms examiner at the Harris County Institute of Forensic Sciences, testified that all the cartridge casings recovered from the shooting scenes on Bridgeport Road, Kelling Street, and Hooper Road were fired from the same firearm. Further, in Bassett's opinion, the projectiles and bullet fragments that were recovered from the three shooting scenes were fired from the same firearm.

---

[10] Other witnesses testified that appellant was seen driving the silver Kia Forte on the night of May 6, 2020, and appellant was found driving the car by law enforcement officers in the early morning hours of May 7, 2020.

11

Dr. Marianne Beynon, an assistant medical examiner at the Harris County Institute of Forensic Sciences, testified that she performed an autopsy on each complainant. The first complainant suffered five gunshot wounds, and his cause of death was multiple gunshot wounds.[11] The second complainant suffered two gunshot wounds, and his cause of death was a gunshot wound to the chest. The third complainant suffered one gunshot wound, and his cause of death was a gunshot wound to the abdomen. Dr. Beynon testified that the manner of death for each complainant was homicide.[12]

### Standard of Review

We review complaints of jury-charge error under a two-step process. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). First, we must determine whether error exists in the charge, and, second, if error does exist, whether sufficient harm resulted from the error to require reversal. *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d at

---

[11] The first complainant's toxicology report was positive for cocaine and benzoylecgonine, which "is a metabolite which forms when someone uses cocaine and drinks ethanol or alcohol at the same time." But the first complainant did not have any ethanol in his system.

[12] We note that additional witnesses testified at trial and additional evidence was admitted. The Court has reviewed the complete record in the instant appeal, including all testimony and evidence admitted during trial. *See* TEX. R. APP. P. 47.1; *see also Adell v. State*, No. 01-21-00439-CV, 2023 WL 4938111, at *32 n.54 (Tex. App.—Houston [1st Dist.] Aug. 3, 2023, pet. ref'd) (mem. op., not designated for publication) (noting appellate court reviewed complete record).

731–32. If the defendant preserved error by timely objecting to the charge, an appellate court will reverse if the defendant shows that he suffered some harm as a result of the error. *Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). We review a trial court's decision not to submit an instruction in the jury charge for an abuse of discretion. *See Wesbrook v. State*, 29 S.W.3d 103, 121–22 (Tex. Crim. App. 2000).

## Jury Charge

In his sole issue, appellant argues that the trial court erred in denying his request for a jury instruction on self-defense related "to the shooting of [the first complainant]" because "there was some evidence that he believed the use of deadly force was immediately necessary to protect himself against [the first complainant's] attempted use of deadly force." *See* TEX. PENAL CODE ANN. §§ 9.31, 9.32.

The trial court shall deliver to the jury a written charge "distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14. The purpose of the jury charge is to inform the jury of the applicable law and guide the jury in its application to the case. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007).

A defendant is entitled to a jury instruction on any defensive theory raised by the evidence or testimony when such an instruction is properly requested. *Krajcovic v. State*, 393 S.W.3d 282, 286–87 (Tex. Crim. App. 2013); *Booth v. State*, 679

13

S.W.2d 498, 500 (Tex. Crim. App. 1984); *see also* TEX. PENAL CODE ANN. § 2.03(c).

Whether the evidence or testimony is presented by the defense or the State is

irrelevant, as is the strength of the evidence or testimony. *Booth*, 679 S.W.2d at 500.

Determining "[w]hether a defense is supported by the evidence is a sufficiency

question reviewable on appeal as a question of law." *Shaw v. State*, 243 S.W.3d

647, 658 (Tex. Crim. App. 2007). When the evidence fails to raise a defensive issue,

the trial court does not err by refusing the defendant's requested instruction. *Muniz*

*v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993).

Texas Penal Code section 9.31 states that "a person is justified in using force

against another when and to the degree the actor reasonably believes the force is

immediately necessary to protect . . . against the other's use or attempted use of

unlawful force." TEX. PENAL CODE ANN. § 9.31(a); *see also Henley v. State*, 493

S.W.3d 77, 89 (Tex. Crim. App. 2016). The use of deadly force against another is

justified "if the actor would be justified in using force against the other under [Texas

Penal Code] [s]ection 9.31" and "the actor reasonably believes the deadly force is

immediately necessary . . . to protect the actor against the other's use or attempted

use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a). A reasonable

belief is a belief that would be held by an ordinary and prudent person in the same

circumstances as the actor. *Id.* § 1.07(a)(42). The use of force against another is not

justified in response to verbal provocation alone. *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017).

Here, appellant asserts that the trial court erred in denying his request for a jury instruction on self-defense related "to the shooting of [the first complainant]." But not all jury-charge errors require reversal on appeal. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). Thus, even were we to conclude that the trial court erred in denying appellant's requested self-defense instruction, then, because appellant preserved his complaint by objecting in the trial court, we would reverse the trial court's judgment only if the record showed that appellant suffered some harm as a result of the error. *See Sakil*, 287 S.W.3d at 25–26. In demonstrating that "some harm" occurred, appellant must also show that he suffered some actual, rather than merely theoretical, harm from the error. *See Reeves*, 420 S.W.3d at 816. We assess harm by considering (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of the probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

For purposes of this opinion we will presume, without deciding, that the trial court erred in refusing to instruct the jury on self-defense. But appellant, in his

15

briefing, includes only two conclusory sentences related to whether he suffered harm as a result of the trial court's purported error, stating:

> Failing to instruct the jury on self-defense, as it applied to [the first complainant's] shooting, prevented [appellant] from arguing the issue and denied the jury the opportunity to consider self-defense. Had the jury been able to consider self-defense it is not inconceivable that a juror would have had a reasonable doubt about appellant's guilt.

This is not sufficient. *See* TEX. R. APP. P. 38.1(i); *see also Alvarado v. State*, 912 S.W.2d 199, 210 (Tex. Crim. App. 1995) (briefing that does not comply with Texas Rule of Appellate Procedure 38.1 presents nothing for appellate court to review); *King v. State*, 17 S.W.3d 7, 23 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (conclusory arguments present nothing for our review).

An appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). And an appellant waives an issue on appeal if he does not adequately brief that issue by presenting supporting arguments, substantive analysis, and citation to authorities and the record. *See id.*; *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000); *Wilson v. State*, 473 S.W.3d 889, 901 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd); *see also Wyatt v. State*, 23 S.W.3d 18, 23 n.5 (Tex. Crim. App. 2000) ("We will not make [defendant]'s arguments for him . . . ."); *Lawton v. State*, 913 S.W.2d 542, 554, 558, 560 (Tex. Crim. App. 1995) (failure to adequately brief

issue, either by failing to specifically argue and analyze one's position or provide authorities and record citations, waives any error on appeal), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998); *Alvarado*, 912 S.W.2d at 210 (where appellant's point of error inadequately briefed, appellant "present[ed] nothing for . . . review").

Because appellant, in his brief, offered no substantive analysis, explanation, or appropriate citation to the record, to support his bald assertion that he was harmed by the trial court's failure to instruct the jury on self-defense related to the shooting of the first complainant, we hold that he has waived his jury-charge complaint on appeal. *See, e.g.*, *Torres v. State*, 979 S.W.2d 668, 674 (Tex. App.—San Antonio 1998, no pet.) (defendant's jury-charge complaint waived because of inadequate briefing); *see also Brown v. State*, Nos. 01-18-00594-CR, 01-18-00595-CR, 2020 WL 4210630, at *3–4 (Tex. App.—Houston [1st Dist.] July 23, 2020, no pet.) (mem. op., not designated for publication) (holding defendant waived complaint trial court erred by denying his requested jury instruction due to inadequate briefing); *Jones v. State*, No. 01-09-00267-CR, 2010 WL 5395682, at *8 (Tex. App.—Houston [1st Dist.] Dec. 30, 2010, no pet.) (mem. op., not designated for publication) (defendant waived complaint trial court erred by denying his requested instruction where defendant provided no meaningful argument or analysis in his briefing).

## Conclusion

We affirm the judgment of the trial court.

Julie Countiss
Justice

Panel consists of Justices Goodman, Countiss, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).